In re MARRIAGE OF RUTH J. SMITH, Petitioner-Appellant, and W. H. SMITH, a/k/a Harry Smith, Respondent-Appellee.

Second District No. 78-376

Opinion filed November 5, 1979.

Allen S. Greene, of Greene, Murphy, Jones & Brisske, of Wheaton, for appellant.

R. Craig Loveless, of Gregory A. Jennings and Associates, and Richard B. Harty, of McGrath & Harty, both of Wheaton, for appellee.

Mr. PRESIDING JUSTICE GUILD delivered the opinion of the court:

Ruth J. Smith appeals from a divorce decree challenging the sufficiency of the maintenance and property awards granted her and the denial of her request for attorney's fees.

On July 13, 1976, W. H. Smith (hereinafter the husband) sued his wife Ruth for divorce. After numerous pleadings, Ruth Smith (hereinafter the wife) ultimately counterclaimed for divorce. The trial court granted a dissolution of the parties' marriage and on April 28, 1978, ordered that: (1) the husband shall pay $100 per week in permanent maintenance; (2) the marital home should be sold within four months and the net proceeds divided equally; (3) all savings and checking accounts shall be divided equally between the parties, and (4) each party shall pay his or her own attorney's fees.

The basic question presented in this case is whether a husband has the right to retire at an early age during the pendency of the divorce proceedings brought initially by himself. It appears that the husband, age approximately 54 during the divorce proceedings, was in good health.

The Smiths were married in 1943 and separated in 1976. They have five children, ranging in age from 21 to 28 years of age, none of whom is dependent upon their parents for support. The husband graduated from

the University of Illinois with a degree in sanitary engineering in the late 1940's and was employed by the Cast Iron Pipe Research Association (CIPRA) from 1956 until he resigned effective December 31, 1977. He has been a recognized expert in the cast iron pipe area for several years. At the time of his resignation the husband was the president of CIPRA with a salary of $50,000 per year and fringe benefits, including an automobile and an expense account. He had earned over $40,000 per year for several years. He retired, according to his letter to the board of directors of CIPRA, because:

> "I have had a wish to work as an individual consultant and have now determined that I will embark on this new venture in January, 1978."

The husband testified that he resigned because he had had to work 60-80 hours per week as president of CIPRA and that he no longer wanted to work at such a demanding job. Mrs. Smith contends that his resignation was motivated, in significant part, by a desire to punish her for her refusal to agree to his offers of settlement.

In January 1978 the husband set up a corporation from which he hoped to work as a consultant. The husband is the owner, director and chief operating officer of the corporation; it is essentially a one-man operation. The corporation had purchased a pickup truck and some instruments worth between $2000 and $2500 prior to the time of the hearing in May 1978. His new consulting firm had been hired by CIPRA, primarily so that the husband could train his successor as president of that organization. He was paid $200 per day for this service and had either received or was owed approximately $5300 from CIPRA at the time of the hearing. He had $350 in his individual bank account and approximately $600 in the consulting firm's account as of February 1978. Besides the potential income from his consulting firm, the husband has been receiving $41 per month in disability benefits and began receiving about $400 per month in retirement benefits from CIPRA as of May 1978.

The husband lives with his parents on their farm and estimated his current living expenses at $400 per month. He was contemplating the rental of a house in which to live and from which he could operate his consulting business and estimated his eventual living expenses to be $600 per month. The husband was 54 years of age and in good health at the time of the hearing.

The wife is 54 years old. She has a high school education and "some" college before her marriage and worked as a receptionist to help put her husband through school after World War II. During the marriage she was the homemaker with primary responsibility for cooking, cleaning and the care and raising of the couple's five children. In 1973 she began to work part time as a real estate salesperson and earned a total of approximately

$10,000 at that work over the next three years. She left voluntarily because she "wasn't making enough money for the amount of time I was putting into it." She then had a part-time job as a receptionist/typist in 1977 at $2.50 per hour. She is currently taking courses at the local community college with the goal of acquiring an associate's degree.

The parties own a home in Wheaton in joint tenancy. The wife estimates it to be worth $60,000, and the husband estimates it to be worth $75,000. The wife has been living in the home since the separation and has been making the monthly mortgage payments of $141.75 and has also been paying the taxes and insurance on the home. The parties have a joint savings account which was established with $3500, including approximately $1000 that the wife's father had left her at his death. This account apparently had over $3000 in it at the time of separation and had "a little over" $2000 at the time of the proveup. The wife had used this account to help pay living expenses during separation and had drawn out $300 to cover a check the husband had written for his attorney's fees. The wife also has her own savings account which contained about $1000 at the time of the separation.

The wife testified that in the last few years her lifestyle with her husband had been "very comfortable," that she and her husband had traveled and that she could get the clothing she needed and didn't have to worry about the cost of groceries. The parties have been able to have their own automobiles and give each of the five children a college education. The family has no substantial debts outside of the $5000 mortgage on the home. The wife estimated her yearly living expenses to be $18,394.48 or $1588.04 per month. This figure was challenged by the husband who claims that it is excessive.

We turn first to the wife's contention that $100 per week was an insufficient maintenance award under the circumstances herein. Section 504 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 504) provides the appropriate standards to be considered by the trial court in determining an award of maintenance. Among the considerations articulated in this statute are the standard of living during the marriage, the duration of the marriage, the age and physical condition of both parties, the financial resources of the party seeking maintenance, and the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

The wife contends that the maintenance award was insufficient due to the trial court's error in not considering the husband's ability to provide support but based the amount of the award on husband's actual income after his retirement from CIPRA. This contention assumes that the trial court did, in fact, base the amount of its award to the wife on the

husband's actual post-retirement income and not on his ability to earn additional funds. However, the record indicates that this assumption may not be totally correct. Although the amount of the award indicated that the trial court did not base the amount on the husband's preretirement income of $50,000 per year, for in this particular case such an income would mandate a higher level of maintenance, the award appears to have been based upon his prospective future earnings as a consultant rather than only upon his then current earnings. The husband's retirement pay and disability benefits, his only definite current income, is almost exactly the $5200 per year awarded to the wife. Under such circumstances it is possible that the trial court based the award on the assumption that the husband would have additional funds available, either from his new consulting business or from some other source.

■■■ The wife cites our recent case of *Shellene v. Shellene* (1977), 52 Ill. App. 3d 889, 368 N.E.2d 153, as standing for the proposition that a maintenance-paying spouse's retirement plan "had to be prepared so that they included the proper allowance for the ex-wife's support." The husband contends *Shellene* is not controlling as the reduction in the husband's salary occurred after the decree of divorce while herein the husband retired during the pendency of the dissolution hearings. We disagree. In *Shellene* we held the reduction of alimony was not equitable. We find herein that the facts are more persuasive than in *Shellene* in that the retirement of the husband during the pendency of the marriage dissolution proceeding appears to be an attempt to avoid maintenance of the wife. The husband herein is in good health and approximately the same age as the husband in *Shellene*. It is important to note that the husband's use of the word "retirement" to describe his voluntary leaving of his job and subsequent reduction of his income does not automatically confer some preferred status upon his actions. The Act refers to the "ability" of the maintenance-paying spouse to contribute to the other's support. In our view, the word "ability" indicates that we should consider the level at which the maintenance-paying spouse is able to contribute, not merely the level at which he is willing to work. Thus, we hold that it was appropriate for the trial court to look at the husband's prospective income, as well as his current actual income, in setting the level of maintenance, particularly where the difference between actual and potential income is a result of totally voluntary retirement. As the Colorado Court of Appeals noted in interpreting a statute identical to our own:

> "This language does not restrict a court to considering only his actual income at the time of trial, but also allows it to weigh evidence of its reasonable potential earning capacity. * * * [The husband] is free to chose his own lifestyle and to cease to be a productive individual in our social structure if he can afford such

luxury. However, * * *, certain responsibilities assumed must be met within the confines of the law." (*In re Marriage of McCarthy* (Colo. App. 1975), 533 P.2d 928, 930.)

Whether a spouse may voluntarily retire or cut back on his income depends on the circumstances of each case. Relative factors are the age, health of the party, his motives in retiring, the timing of the retirement, his ability to pay maintenance even after retirement and the ability of the other spouse to provide for himself or herself.

Our courts have considered many reduction of income situations in the context of petitions for post-decree modifications of maintenance. An excellent review of these cases is presented in *Blowitz v. Blowitz* (1966), 75 Ill. App. 2d 386, 391-92, 221 N.E.2d 160, 164, in which the court noted that:

"Our courts have been sympathetic to pleas for a reduction in alimony payments where some *fortuitous occurrence* has diminished the ability of the husband to meet his obligation to his former wife. But where the change in circumstances has been brought about by the actions of the husband the courts have refused to allow a reduction." (Emphasis added.)

We thus turn to the question of the amount awarded as maintenance in this particular case. The parties were married at an early age and the wife assisted the husband in getting his college degree from the University of Illinois Engineering School by working as a secretary. In the following years she maintained the household, raising five children who are now of age. Thirty-five years after the marriage the husband then filed suit for divorce, alleging mental cruelty. The husband left a job paying $50,000. Although his desire to no longer work 60-80 hours a week seems reasonable, the circumstances surrounding his retirement do call his motives into question.

The parties were married for 34 years; the wife was 52 years old and has little prospect of earning an adequate salary. Furthermore, she is being forced to work full time in order to maintain a standard of living which will be much lower than what she enjoyed during the marriage. In addition, the wife has little security for the future in terms of retirement or illness, especially in the event that her husband does predecease her. On the other hand, we recognize that the husband does have a right, *at some point*, to retire or to substantially reduce his working hours.

These facts do not justify a reduced maintenance award because of the husband's resignation from CIPRA. He has not reached the customary retirement age in our society; his health is good. His resignation was the result of circumstances completely under his control rather than anything fortuitous. Furthermore, the circumstances and timing of his resignation call his motives in doing so into question.

■■ The husband contends that requiring a man to support his ex-wife is

"peonage" and is therefore violative of the thirteenth amendment of the United States Constitution which prohibits slavery and involuntary servitude. This argument is completely without merit. Purely monetary obligations, whether based on ordinary commercial contracts or upon a relationship such as marriage or parenthood cannot be equated with peonage or slavery.

■■ We cannot and do not hold that the husband must continue working at CIPRA, or at any other particular job or, indeed, at all. We merely hold that the amount of maintenance he must pay to the wife must be calculated on the basis of his ability to pay which, in turn, is linked to the amount he could have made had he chosen not to resign.

As we have noted, on the basis of his $50,000 per year salary at CIPRA, and considering the wife's standard of living prior to the parties' separation, the $100 per week awarded by the trial court is insufficient and should be substantially raised.

■■ The wife contends that the division of property was incorrect and alleges that the trial court, by equally dividing the equity in the marital home, failed to consider the "reasonable opportunity of each spouse for future acquisition of capital assets and income." (Ill. Rev. Stat. 1977, ch. 40, par. 503(c)(10).) The wife argues that while the other factors listed in the statute are substantially equal for both parties, there is a clear discrepancy in their abilities to earn income. This argument is especially persuasive in light of the wife's age, lack of job skills and late entry into the job market. Her prospects of retiring at age 65 with sufficient income are unlikely. This is especially true if her health fails or if her husband predeceases her, thus terminating the alimony. When these factors are considered in relation to the husband's relatively promising prospects of the future, the inequity seems clear. Therefore, we hereby reverse and remand that portion of the trial court's order dealing with the division of the proceeds from the sale of the marital home for further consideration of subsections 503(c)(3), (4), (7), (9) and (10) of the Marriage and Dissolution of Marriage Act.

The second dispute relating to the property award focuses on the $1000 the wife inherited from her father and which was placed in the joint savings account of the parties. The wife contends that this $1000 should be awarded to her as her individual, nonmarital property rather than treating the entire savings account as marital property to be divided equally. Section 503 of the Act (Ill. Rev. Stat. 1977, ch. 40, par. 503) states that all property acquired during the marriage is presumed to be marital property. This presumption is overcome by a showing that the property was acquired by certain methods, one of them being by inheritance. The party claiming that the property is nonmarital has the burden of proof. In the case herein the wife shows that the property was nonmarital when it

was acquired but it is clear that it did not retain this characteristic. At issue is under what, if any, circumstances nonmarital property placed into a savings account or other asset with marital property may retain its nonmarital identity.

Other appellate districts have recently considered this issue, but with somewhat different results. In *Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513, 386 N.E.2d 517, the court held that the failure to properly segregate nonmarital property by commingling it with marital property would cause the nonmarital property to be transformed into marital property. In that case the parties had opened a joint savings account by each contributing their own nonmarital funds. During the course of the marriage marital funds were added to the account. Upon divorce the wife wanted to recover the nonmarital funds which she had contributed to the account, which were larger than the husband's contribution. The court held, however, that the act of commingling in a joint account indicated an intent to treat the property as marital property and thus ruled that the wife could not recover her disproportionate share as nonmarital property.

The wife has cited *In re Marriage of Key* (1979), 71 Ill. App. 3d 722, 389 N.E.2d 963, as authority for the proposition that she should be reimbursed the $1000 inheritance. We do not find that the facts in that case are applicable to the situation before us where the wife merely deposited her inherited funds in the parties' joint checking account. We therefore find that the trial court was correct in its decision to treat the savings account as marital property.

The wife's final contention concerns the denial of her request for attorney's fees. In support of this contention she has cited *Kaufman v. Kaufman* (1974), 22 Ill. App. 3d 1045, 318 N.E.2d 282. It has been stated in this State that the granting of attorney's fees in a divorce action is discretionary with the trial judge, but that it depends on the relative ability of the parties to pay. Inasmuch as this case is being reversed and remanded for further hearing on the distribution of the equity in the marital home as being against the manifest weight of the evidence, the question of awarding attorney's fees to the attorney for the wife should be reconsidered by the trial court. In the event that the equity is awarded to the wife, she then should be in a position to pay her own attorney's fees.

To summarize, we reverse and remand on the issue of the amount of maintenance. We reverse and remand on the issue of the division of the proceeds from the sale of the marital home. We affirm on the issue of the division of the joint savings account. We reverse and remand on the issue of which party is to pay the wife's attorney's fees.

Affirmed in part; reversed in part; remanded in part with instructions.

SEIDENFELD and LINDBERG, JJ., concur.