Dolores G. SMITH

v.

Franklin R. SMITH.

Supreme Judicial Court of Maine.

Argued Sept. 12, 1980.

Decided Sept. 26, 1980.

Isaacson, Isaacson & Hark, Philip M. Isaacson, Robert S. Hark (orally), Lewiston, for plaintiff.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Donald A. Fowler, Jr., Charles S. Einsiedler, Jr., Portland (orally), for defendant.

Before GODFREY, NICHOLS and ROBERTS, JJ., and DUFRESNE, A. R. J.

GODFREY, Justice.

The parties, formerly husband and wife, both appeal from a judgment of the Superior Court reducing Dr. Franklin R. Smith's alimony payments from $300 per week to $250 per week. We affirm the judgment and order below.

On May 7, 1976, Mrs. Smith obtained a divorce from Dr. Smith in Superior Court. In one provision of the decree Dr. Smith was ordered to pay Mrs. Smith $300 per

week as alimony. Dr. Smith was then a practicing dentist earning about $29,000 per year. The property set aside to Dr. Smith at the time of the divorce included substantial assets available to satisfy the alimony.[1]

Dr. Smith remarried in September of 1977. Through the next two years he transferred to his second wife, Barbara Edwards, gifts of cash and personalty amounting in value to about $140,000. During that interval he also made charitable contributions in the amount of $26,000. While making gifts to charity and to Ms. Edwards, Dr. Smith was aware that his generosity might jeopardize his alimony payments to Mrs. Smith. He was likewise aware that his dental practice might be coming to a close. By 1979, his annual income from dentistry had declined to $21,000. He was sixty–four years old, and he testified that he suffered from high blood pressure, stomach complaints, leg cramps, gout, and allergies from his patients' cosmetics. His office was located in a building that was scheduled to be demolished. Motivated at least in part by his poor health and declining practice, Dr. Smith retired from dentistry on May 17, 1979. After his retirement his annual income was reduced to about $7,000, the amount of his social security benefits.

Five days after he retired from dentistry Dr. Smith filed in Superior Court a motion to modify the divorce judgment. He alleged that he had been forced to retire because of poor health and was now financially unable to pay alimony in the amount of $300 per week. Accordingly, he asked that the divorce judgment be amended to reduce the amount of his alimony payments. Promptly after filing his motion to modify, Dr. Smith ceased making alimony payments to plaintiff, who thereupon filed in Superior Court a motion for arrearage and contempt.

After three hearings, the Superior Court justice ruled on Mrs. Smith's motion for contempt and on Dr. Smith's motion to modify. Because the fact of Dr. Smith's arrearages was undisputed, the trial court requested the parties to prepare a supplemental order stating the amount of arrearage due. On the motion to modify, the court found that although Dr. Smith's earned income was reduced by his retirement, he still had assets from which the funds to pay alimony could be derived. The court also found that Dr. Smith had given Ms. Edwards gifts of considerable value while fully aware of his pre–existing alimony obligation. On these facts, the trial justice reduced Dr. Smith's alimony obligation prospectively from $300 per week to $250 per week. In addition, he awarded Mrs. Smith her counsel fees. Dr. Smith has paid his arrearages of alimony.

1. *Dr. Smith's Retirement as a Ground for Reducing his Alimony Obligation*

Mrs. Smith asserts that it was an abuse of discretion to reduce Dr. Smith's alimony obligation because he had voluntarily reduced his earnings by retiring. Dr. Smith contends that because his retirement was not motivated primarily by a desire to avoid his alimony obligation, the income reduction caused by his retirement was a proper ground for reducing his alimony payments.

■ As a general principle, a trial justice has discretion to modify an award of alimony on the ground of substantial change in the payor spouse's financial condition. *See Bubar v. Plant*, 141 Me. 407, 44 A.2d 732 (1945). The main issue on appeal is whether the trial justice abused his discretion in finding that Dr. Smith suffered a substantial adverse change in financial condition because of his voluntary retirement.

■ In jurisdictions that have addressed the issue, the traditional view is that, ab-

---

1. In his order, the trial justice said:

Much of the value of these assets consists of paintings of Defendant's grandfather (Xanthus Smith) and great–grandfather (Russell Smith), well–known artists, painters of early American scenes. Defendant is actively seeking to sell those paintings, or most of them, and there was no significant sentimental value evidence adduced to justify the Court in not considering them as assets available from which the alimony obligation could be satisfied. Other substantial assets of Defendant have been taken into account as well.

sent a substantial showing of good faith, a voluntary reduction of income or self–imposed curtailment of earning capacity does not constitute such a change of circumstances as warrants modification of an alimony decree. *See, e. g., Tydings v. Tydings,* 349 A.2d 462 (D.C.App.1975); *Blowitz v. Blowitz,* 75 Ill.App.2d 386, 221 N.E.2d 160 (1966); *McKey v. McKey,* 228 Minn. 28, 36 N.W.2d 17 (1949); *Crosby v. Crosby,* 182 Va. 461, 29 S.E.2d 241 (1944); *Lambert v. Lambert,* 66 Wash.2d 503, 403 P.2d 664 (1965). However, the wide range of fact patterns makes application of the rule difficult. When the payor spouse retires at an early age though able to work, reduction in alimony payments may be properly denied. *See, e. g. Commonwealth ex rel. Saul v. Saul,* 175 Pa.Super. 540, 107 A.2d 182 (1954). At the extreme, an intermediate Missouri court went so far as to deny reduction of alimony to a 62–year–old man who had had a malignant kidney removed and could not find employment in the industry in which he had worked all his life. *See Sifers v. Sifers,* 544 S.W.2d 269 (Mo.App.1976). We think the rule should not be so remorselessly applied.

The difficulty in applying the rule stems partly from the lack of precision in the concept "substantial showing of good faith." One decision has attempted to sharpen the focus of the rule by holding that voluntary retirement will be a ground for reduction of alimony if it is not done for the sole purpose of reducing the funds available for alimony payments. *Commonwealth ex rel. Burns v. Burns,* 232 Pa.Super. 295, 331 A.2d 768 (1974). Under such a formula, however, the payor spouse would nearly always be able to cite at least one legitimate purpose for his retirement; the danger of pretext is great.

■ The better rule appears to be that retirement of the payor spouse for the primary purpose of avoiding alimony does not of itself bring about the substantial change in the payor's circumstances needed to justify a reduction in alimony. Such a rule does not place an undue burden on the payor spouse who retires in complete good faith. On the other hand, as compared with the sole–purpose rule, the primary–purpose rule allows a more searching inquiry into the financial circumstances of the retiring party and makes it more difficult for a parsimonious payor spouse to disguise his motives for retiring. As was said in *In re Marriage of Smith,* 77 Ill.App.3d 858, 862–63, 33 Ill.Dec. 332, 336, 396 N.E.2d 859, 863 (1979):

> It is important to note that the husband's use of the word 'retirement' to describe his voluntary leaving of his job and subsequent reduction of his income does not automatically confer some preferred status upon his actions.

. . . . .

Whether a spouse may voluntarily retire or cut back on his income depends on the circumstances of each case. Relative factors are the age, health of the party, his motives in retiring, the timing of the retirement, his ability to pay maintenance even after retirement and the ability of the other spouse to provide for himself or herself.

■ In the present case the trial justice took Dr. Smith's retirement into account in reducing his alimony obligation but made no express factual finding concerning Dr. Smith's purposes in retiring. Neither party requested specific findings of fact or conclusions of law pursuant to M.R.Civ.P. 52(a). Therefore we must assume that the judge found all the facts necessary to support his decision. *Conover v. Conover,* Me., 403 A.2d 352, 353–54 (1979). Normally, such assumed findings, supported by credible evidence in the record, will be upheld. *Id.* Where the question is one of the modification of alimony or support, however, an even more deferential standard of review is applicable: Absent a violation of some positive rule of law, this Court will overturn the trial court's decision of such a question only if it results in a plain and unmistakable injustice, so apparent that it is instantly visible without argument. *Small v. Small,* Me., 413 A.2d 1318, 1321 (1980); *Capron v. Capron,* Me., 403 A.2d 1217, 1218 (1979).

On this record, the trial justice could have rationally found that Dr. Smith retired for the primary purpose of avoiding alimony. He retired after making large gifts to charity and to his second wife, well aware that his actions in combination might jeopardize his ability to pay alimony. Nevertheless, in view of Dr. Smith's advancing age, his asserted health problems, and the difficulties he foresaw in relocating his office, the trial judge could also have rationally concluded that Dr. Smith's retirement was not motivated primarily by a desire to reduce his alimony payments. The trial court's decision cannot be characterized as a plain and unmistakable injustice. Accordingly we must affirm the trial justice's decision to regard Dr. Smith's retirement as a ground for modifying the alimony decree.

## 2. The Role of Non–marital Property in Determining the Amount of Alimony Payments

Having persuaded the trial judge to consider his retirement as a valid ground for alimony modification, Dr. Smith objects to the court's failure to reduce his alimony payments by more than $50 per week. In Dr. Smith's view, the only factor material to the decision was the decline in his income from $29,000 at the time alimony was first ordered to $7,000 at present. Mrs. Smith argues that the trial court properly considered the substantial amounts of convertible assets which were at Dr. Smith's disposal. Characterizing those assets as non–marital property, Dr. Smith contends that when the divorce decree set aside non–marital property to each party such property was meant to be exempt thereafter from the other party's claims. Therefore, he says, he could not be placed in a position where he would have to liquidate his non–marital assets in order to satisfy his alimony obligation.

The statute governing awards of alimony, 19 M.R.S.A. § 721 (Supp.1979–80), does not expressly limit the trial judge's inquiry to the amount of the payor spouse's present income: "The court may decree to either spouse reasonable alimony out of the estate of the other spouse, having regard to that spouse's ability to pay ...."[2] Construing a predecessor of this statute, this Court stated that alimony must be based on the payor spouse's total financial resources, not merely his current income. *Strater v. Strater*, 159 Me. 508, 517, 196 A.2d 94, 99 (1963). That construction of section 721 was not affected by the enactment in 1971 of 19 M.R.S.A. § 722–A (Supp.1979–80), the statute governing division of the spouses' property on divorce. The provisions of section 722–A are derived from section 307 of the Uniform Marriage and Divorce Act as originally promulgated by the Conference of Commissioners on Uniform State Laws in 1970,[3] and were designed to replace the ancient provisions in the former version of 19 M.R.S.A. § 721 for setting aside to the wife a share of her husband's estate when divorce was decreed to the wife on the ground of the impotence or fault of the husband or for other cause. There is no basis in the marriage and divorce statutes of this State for supposing that the provisions for division of property in section 722–A were intended to abrogate or limit the traditional discretion of the trial judge to determine the amount of alimony as justice may require in the light of the relative needs and resources of the parties. The fact that in the same measure that enacted section 722–A the legislature amended section 721 without any provision limiting the source of funds from which alimony may be derived, is strong evidence to the contrary.[4]

---

2. The prototype of the present version of 19 M.R.S.A. § 721 may be found in P.L. 1821, ch. 71, § 5.

3. *See* Comment, *The Maine Marital Property Act: The Duties of Divorce Courts and the Right to an Equitable Share of Marital Assets*, 31 Maine L.Rev. 333, 334 (1980).

4. The Uniform Act recognizes the possibility that a setting aside of the parties' non–marital property and a division of their marital property may not complete the adjustment of the parties' financial affairs:

 The Act authorizes the division, upon dissolution, of property acquired by either spouse

Dr. Smith further argues that even if his non–marital assets may be considered in determining the amount of alimony, his payments should be reduced by far more than $50 per week since his pre–modification alimony payments amounted to $15,600 per year while his post–retirement income is only about $7,000 per year. This argument attempts again to focus attention on Dr. Smith's present income while ignoring his other financial resources. The trial judge found that Dr. Smith had substantial assets from which his alimony obligation could be satisfied, and in the record of this case we have no basis for disturbing either that finding or the trial justice's decision about the comparative weight to be given Dr. Smith's loss of professional income and his retention of income–producing assets.

As a last resort, Dr. Smith argues that the trial justice abused his discretion by reducing Dr. Smith's alimony payments by only 16.7 percent when his income had declined by 25 percent between the date of his divorce and the date of his retirement. For the reasons stated above, this contention is groundless. Furthermore, any such mechanical rule restricting the trial judge's discretion would make little sense.

### 3. *Attorney's Fees*

 In his modification order, the trial judge awarded Mrs. Smith her attorney's fees. Since he was successful in obtaining a reduction in his alimony payments, Dr. Smith regards himself as the "prevailing party" in the action. For that reason Dr. Smith asserts that he was the only litigant entitled to attorney's fees. The argument fails for two reasons: First, Mrs. Smith was

also a "prevailing party" on her motion for contempt and for payment of arrearage. The fact that Dr. Smith did not dispute his failure to pay alimony did not render him the victor on this point. Second, and more important, the statute governing alimony payments, 19 M.R.S.A. § 721 (Supp.1979–80), states that "The court may ... order [the payor spouse] to pay sufficient money for the defense or prosecution of hearings regarding alimony." This language does not limit the award of counsel fees to actions where the payor spouse is the losing party. Generally speaking, an award of counsel fees is to be based on the parties' relative capacity to absorb the costs of litigation. *See, e. g., Gammel v. Gammel*, 90 Cal.App.3d 90, 153 Cal.Rptr. 169, 173 (1979). In light of the trial justice's findings concerning the litigants' unequal financial strength, he acted within his discretion in awarding Mrs. Smith her attorney's fees.

There are no other issues in the case requiring the attention of this Court.

The entry is:

Both Mrs. Smith's appeal and Dr. Smith's cross–appeal are denied.

Judgment affirmed.

Dr. Smith to pay costs of this appeal.

All concurring.

during the marriage ... as the primary means of providing for the future financial needs of the spouses. Where the marital property is insufficient for this purpose, the Act provides that an award of maintenance can be made to either spouse under appropriate circumstances to supplement the available property.
Uniform Marriage and Divorce Act, Commissioners' Prefatory Note, 9A *Uniform Laws Annotated* 93 (1979). Section 308 of the Uniform Act, which Maine has not adopted, provides that the amount of maintenance is to be based

not merely on present income but, among other things, on the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance. Under the Uniform Act, if maintenance is to be paid after division of the marital property and if the court may consider resources besides present income when setting the level of maintenance, maintenance must necessarily be payable from non–marital property. *See In re Marriage of McCarthy*, 533 P.2d 928 (Colo. App.1975).