No. 3–10–0039

Opinion filed March 9, 2011

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2011

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| EARL D. LICHTENAUER, | ) | LaSalle County, Illinois, |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | No. 07–D–405 |
| and | ) | |
| | ) | |
| JOANNE LICHTENAUER, | ) | Honorable |
| | ) | Joseph P. Hettel, |
| Respondent-Appellee. | ) | Judge Presiding. |

JUSTICE WRIGHT delivered the judgment of the court, with opinion.
Presiding Justice Carter and Justice Schmidt concurred in the judgment and opinion.

**OPINION**

Appellant Earl D. Lichtenauer and appellee Joanne Lichtenauer were married in 1976. Joanne originally filed a dissolution action in Will County, Illinois, in 2005, which she dismissed in 2007. Immediately thereafter, Earl filed a dissolution action in La Salle County, Illinois, in 2007. During a contested hearing in La Salle County, regarding the distribution of the marital assets, evidence was introduced showing that Earl sold his interest in Cipher, Ltd. (Cipher), and Baum Signs, Inc. (Baum Signs), during the course of the dissolution proceedings. Just prior to dissolving Baum Signs in March 2006, Baum Signs' corporate attorney, Mr. Joyner, formed the

1

new corporation called Correct Electric, Inc. (Correct Electric). After selling Baum Signs, Earl became an employee of Correct Electric beginning in 2006 until the date of the contested hearing.

During the contested hearing, the court received evidence that Earl's live-in girlfriend, Linda Mauk, became the president of Correct Electric when it was formed and earned over $120,000 per year in spite of having no previous corporate executive experience or qualifications for this position. Mauk was also the major shareholder, and the shareholder's agreement allowed her to transfer her shares in the company to Earl at any time without the other shareholders' approval. Earl claimed no financial interest in Correct Electric beyond the approximate $70,000 annual salary he received as an employee.

The court found the circumstances surrounding the structure of Correct Electric were a "contrived" arrangement. The court considered Mauk's income when determining Earl's ability to earn income for purposes of setting a permanent maintenance award for Joanne. Based upon the section 504 factors of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/504 (West 2008)), the court awarded permanent maintenance to Joanne in the amount of $1,850 per month. Earl appeals the permanent maintenance awarded to Joanne. We affirm.

BACKGROUND

Appellant Earl D. Lichtenauer and appellee Joanne Lichtenauer were married on September 25, 1976. Joanne had originally filed a petition for dissolution in Will County in 2005. Several pretrial matters were addressed in that case, including an order for an agreed interim distribution of marital assets. The assets addressed in this interim order included proceeds from the sale of Earl's interest in his business corporation, Cipher, and the marital residence. Joanne voluntarily dismissed that case on August 2, 2007, just prior to proceeding to a trial.

2

As a result of that dismissal, Earl filed a petition for dissolution of marriage in La Salle County on August 9, 2007, when both parties were 48 years old and their only child was emancipated. Prior to trial, on August 11, 2008, the court ordered that funds received from the proposed sale of Baum Signs, another company partially owned by Earl, should be held in Earl's lawyer's trust fund until further order of the court. On August 27, 2008, the court awarded Joanne temporary maintenance of $1,200 per month.

On the date of the contested hearing, June 29, 2009, the parties jointly filed a "Final Pretrial Stipulation," which summarized the parties' current assets and liabilities, the values each party assigned to them, the parties' claims as to whether they were marital or nonmarital assets and debts, and the disputed issues to address at the contested hearing.[1] This document listed the following marital assets titled in Earl's name:

| | |
|---|---|
| American Funds | $9,226.49 |
| ING (City of Republic) | $2,191.75 (an IRA with City of Republic) |
| IBEW Local 201 | $129,769.94 (a retirement savings plan) |
| Sheridan Bank MM | $15,005.33 |
| First Bank MM | $18,046.58 |
| Citizens Bank | $4,942.20 |
| Baum Signs Contract | $45,000 (Joanne listed value at $45,000 *plus* interest) |
| 2008 Chevrolet vehicle | Unknown value (Joanne listed value at $36,000) |

The pretrial document listed the values of assets in Joanne's name, as follows:

| | |
|---|---|
| 2000 Mitsubishi vehicle | Unknown value (Joanne listed value at $4,900) |
| Stofan, Agazzi & Co. | $2,520.18 |
| Integra Bank IRA | $3,356.48 |
| Cipher 401(k) | $8,724.99 |
| Tellabs 401(k) | $5,296.26 |
| AIG 401(k) | $1,429.66 |

---

[1] In this document, it appears the initials "MM" refer to money market accounts and "CC" refers to credit card accounts. Additionally, if the values are disputed, Earl's value is listed first and Joanne's value is in parentheses; otherwise, the values are not disputed by the parties.

| | |
|---|---|
| Valic 401(k) | $2,057.49 |
| Residence (Joanne's) | $191,000 (Joanne listed value at $184,000 - disputed) |
| National City MM | $49,000 |
| National City CD | $31,661 |
| Chase | $2,800 |
| West Coast Ins. | $2,800 (Joanne listed none because it is term life account) |

The debts listed in this joint pretrial document were, as follows:

| | | |
|---|---|---|
| Earl as debtor: | Streator  Onized (auto) | $36,614.17 |
| | Mark Anderson | $15,500 |
| | George E. Rydman & Assoc. | $825 |
| | Wade Joyner | $4,500 |
| | | |
| Joanne as debtor: | United - Chase CC | $1,870.95 |
| | Best Buy CC | $719.98 |
| | Macy's CC | $41.22 |
| | Carson Pirie Scott | $723.74 |
| | Attorney Fees & Costs | $12,500 (estimated) |
| | Residential Mortgage | $142,000 (disputed) |

Also in this pretrial stipulation, Earl claimed a Wachovia Securities account in his name, valued at $1,112.63, was his nonmarital property and Joanne claimed an account she had at First National Bank, valued at $13,962, was her nonmarital property.

The hearing on the contested financial issues began on June 29, 2009.  Earl testified that, in 2006, he and another partner, Koby Elleby, sold their interests in Cipher for $528,000 plus full interest in Baum Signs, a subsidiary of Cipher.  Both men split the cash equally and each took one-half interest in Baum Signs.

Earl stated that the Baum Signs stock purchase agreement, plaintiff's exhibit 7, dated August 2, 2007, showed the sale of his interest in Baum Signs for $60,000 to Mark Coyle.  The $60,000 was to be paid to Earl in five installment payments of $12,000, with the first being paid in the fall of 2009.  Earl testified that he opened a new money market account at the Sheridan Bank,

where he deposited the first installment from the Baum Signs sale, and said he has not deposited or withdrawn any funds from that account since that deposit. Prior to dissolving Baum Signs, in March 2006, the corporate attorney, Mr. Joyner, formed the new corporation called Correct Electric, Inc. (Correct Electric), Earl's current place of employment. Earl was shown respondent's exhibit 6, the articles of incorporation for Correct Electric filed on March 1, 2006, which listed two directors for Correct Electric, Earl and Elleby. Earl stated that he was mistakenly listed as a director and that the document was later amended. He testified that he did not have a financial interest in Correct Electric and was only an employee of the company.

According to Earl, since March 2006, he has been employed by Correct Electric as a senior project manager and earns an hourly rate of $34. Earl testified that, prior to 2006, Earl partially owned and worked solely at Cipher receiving gross annual wages of $99,944 (2002); $94,953 (2003); $76,664 (2004); $76,856 (2005).[2]

In 2006, Earl said he worked part of the year at Cipher and worked the remainder of the year at Correct Electric, after selling his interest in Cipher. Earl earned combined gross wages of $70,792 from both Cipher and Correct Electric for in 2006. Earl testified that, in 2007, he earned annual wages at Correct Electric of $70,750 and $71,372 in 2008. Earl testified that, in 2009, his gross income was $71,000, but his annual net income was approximately $50,000, making his monthly net wages from Correct Electric approximately $4,167.

Earl testified about the sale of the marital residence which was authorized through the earlier divorce proceeding in Will County. He stated that he filed a motion in that earlier case

---

[2] The numbers reflect Earl's wages, but the total income in these tax documents additionally reflect passive and nonpassive income and losses to Earl from Cipher while Earl owned an interest in that business.

asking that the marital residence be listed for sale. At that time, Joanne had been living in the marital residence while Earl was living with Mauk, his girlfriend, at her residence. After the marital home was on the market for a period of time, Earl asked the Will County judge to order the parties to accept an offer at a much lower price so the house could be sold.

Joanne objected to accepting this reduced offer and, accordingly, the parties entered an agreed order that the offer could be accepted, but Joanne would get the first $75,000 from those proceeds and Earl would get the balance. In addition, the agreed order stipulated that the amounts in this interim order were not necessarily the final distribution of proceeds from the sale of the residence. The closing occurred on June 1, 2007, and the net proceeds from the sale totaled $92,775.

At the time of the trial, Earl testified that he had no ownership interest in any real estate, but paid $1,000 per month for "rent" to his girlfriend, Mauk, whose monthly mortgage payment was $1,600. Earl stated he lived with Mauk in a residence that she purchased in December 2006, but he had previously lived with her at a different house owned by Mauk. Earl said he also paid the gas bill at his current residence, his share of the Direct TV bill and phone bill, and a share of the electric bill. Earl said he purchased his 2008 Yukon vehicle in 2009, trading in his 2005 Suburban which had a payoff of $22,648 at the time. Earl testified that all of his union retirement benefits accrued during his marriage to Joanne. To the best of his recollection, Earl thought that the First Bank money market account funds were deposited from the sale of his share of the Cipher company, which sold for approximately $264,000.

Earl testified about the Will County case, No. 05–D–1361, interim order granting a distribution of $100,000 each to Joanne and Earl from Earl's lawyer's trust account, leaving a

balance of $64,000. A later agreed order from the Will County case distributed those remaining funds to the parties, giving Joanne 60% or $38,400 and 40% to Earl or $25,600. Earl stated that he deposited his share of this money in the First Bank account, which now had a balance of $18,046.58.

Earl said that he could not invest in Correct Electric at the time it was formed because he had no money to buy any shares. Earl stated he and Elleby had responsibilities at Correct Electric that were comparable to their previous responsibilities at Cipher. However, Earl said he has fewer responsibilities at Correct Electric because he is not an owner. Earl also stated that Mauk was the president of the company, he and Elleby were senior project managers, and his sister, who dates Elleby, was a part owner and secretary of the company. Earl testified that there were 10 initial investors in Correct Electric, 8 of whom were previous employees of Cipher. Earl was then shown respondent's exhibit 12, which was a copy of the shareholders' agreement for Correct Electric. Within that document, other shareholders could not transfer their shares in the business without the consent of the majority of the shareholders, but a special clause in this agreement stated, "[T]he shareholders agree that Linda Mauk [Earl's girlfriend] may directly transfer her shares to Earl Lichtenauer without offering them to the corporation or other shareholders first."

Earl indicated that Baum Signs, for which he owned a half-interest in the company, loaned significant funds, approximately $270,000, to Correct Electric to help start up the new company. Earl said that loan was already paid off with interest.[3] Earl testified that all of the shares for Correct Electric were sold before he received the court-ordered interim distribution of $100,000

---

[3] There is no indication in the record as to where Earl's share of the money from this repaid loan to Baum Signs was deposited or spent.

in August 2006 from the Cipher-sale funds. Earl clarified that all of the capital contributions for Correct Electric were not yet received at that time, but the company had already established who would be the owners or shareholders of the company, including Mauk, who purchased 32% of the company.

Earl initially denied loaning Mauk money to invest in the company during his first day of testimony. The next day, Earl testified that his First Bank account documented that $30,500 was transferred out of his account on September 29, 2006, to Mauk. Earl stated he remembered that he loaned that money to Mauk, although he did not know where she spent that money. Earl claimed he did not to know that there was a transfer to Correct Electric by Mauk, on the same day, in the amount of $30,850.

Earl was asked why he did not use the $30,500 to purchase his own stock for Correct Electric rather than loan money to Mauk, and Earl said his divorce lawyer at the time told him not to invest in the company. Earl also admitted that he wrote a check to Ron Lynjen, who also purchased shares in Correct Electric, for $5,200, in December of 2006, but still denied giving anyone money to assist them in making a capital contribution to Correct Electric.

Earl testified that Mauk had never run any business, or owned a construction business, prior to investing in Correct Electric and becoming the president of the company. Mauk was not a previous employee of Cipher. Joanne's attorney showed Earl respondent's exhibit 16, which consisted of copies of Correct Electric's annual financial statements. According to those documents, the sales revenue for Correct Electric in 2006 was $1.62 million, and in 2007, sales revenue was $4.14 million.

Earl was shown documents showing Mauk's income from Correct Electric in 2007 and

8

2008. Earl's attorney objected to Earl testifying about these documents on hearsay grounds. Joanne's attorney responded that Earl lived with Mauk and shared expenses with her so Earl could testify to his knowledge of her income. Earl was also present during Mauk's deposition where she testified to her income.

After hearing the arguments of counsel, the court ruled that Earl could testify to his knowledge of the income of his paramour, Mauk. Earl was then asked if he was aware what Mauk earned as income generally in 2007. Earl said he did not recall what Mauk earned in 2007 and 2008; in fact, he testified that he did not recall what he earned in 2007. Earl was then asked if the already admitted Correct Electric documents would help refresh his recollection and he was shown the Correct Electric documents. Earl testified that Mauk earned $127,604 in 2008 and $123,525 in 2007. Earl further testified that the board of directors for Correct Electric determines his wages, over which he has no control. He stated that Mauk and his sister, the largest and second largest shareholders respectively, determined the employee wages.

Earl also testified that, during his marriage to Joanne, they bought houses to renovate and resell for a profit which produced additional income. Joanne did not work during the marriage except for occasional part-time employment. Earl was shown Joanne and his joint income tax returns from 2002 through 2007. In 2002, Earl's wages were $99,944.[4] Earl testified that, in the last couple of years, he did not continue to buy and repair houses for profit, but Mauk had bought and sold at least three houses. Earl said that Mauk solely received any profits from those transactions.

---

[4] The 2002 tax return shows total wages to be this amount, but the total income was listed as $111,292, including dividends from Cipher totaling $8,765.

9

Earl testified that the Streator Onized account is the loan for his 2008 truck. Earl explained that the Citizens Bank account was his day-to-day checking account. Earl testified to a check written on April 12, 2007, to Bill Walsh for $24,074.48, and the memo on the copy of the check said, "Linda's new car." Earl admitted that check was written to purchase a new car for his girlfriend, Linda Mauk. Earl also said that he accidentally omitted a golf cart, purchased for $5,534 in July 2007, as an asset in the pretrial stipulation. Earl wrote another check in August 2007 for $20,000, and Earl stated that money was spent on a "shopping spree." Specifically, Earl remembered buying some suits, clothes, tools, and a couple of pieces of antique furniture for himself on that shopping spree, but he did not buy anything for his girlfriend with this money.

Next, Joanne testified to some of the items listed in her financial affidavit. She said that she purchased her current residence on July 23, 2007, for $184,000, and she paid a down payment of $45,900 with interim funds from the Cipher sale. She financed the balance of the sale price through a mortgage from National City Bank and her monthly mortgage payment was $1,272. Joanne testified that she remodeled parts of that house, prior to moving into it, which cost an additional $40,000.

Joanne stated that she has been employed, full-time, by Alverno Clinical Laboratories (Alverno) as an office coordinator since May 2007 and she earns $15.70 per hour for a 40-hour work week. She said her annual income was approximately $31,000. Joanne testified that, during the marriage, Earl was the primary wage earner for the family and she ran the household. She stated that she had part-time jobs during the marriage, such as waitressing and clerical work, but Alverno was her first full-time job. Joanne said she currently attended junior college to obtain an associate's degree, which would take another year and a half to complete. She testified that she

10

did not know whether a degree would increase her pay rate at her current employment.

Joanne said she has been diagnosed with Crohn's disease and spasmodic dysphonia, which is a neurological disorder that affects her vocal chords and intermittently interferes with her speaking ability. Joanne said she receives Botox treatments on her vocal chords for that condition. She stated that Crohn's disease is an autoimmune disease that affects her intestines, for which she has received intravenous treatments at the hospital every eight weeks for the last year and a half. Joanne testified to prescription medications that she also takes regularly.

Joanne testified about the accounts in the final pretrial stipulation. Specifically, Joanne said the First National Bank money market account, currently at $13,962, came from money she received as a result of a personal injury settlement from a car accident in 2001, and she asked the court to find it was nonmarital property. Joanne stated that her accounts at National City Bank, the $31,000 certificate of deposit and the $49,000 money market account, were funds remaining from money she received pursuant to the earlier interim distribution of the money from the sale of Cipher and the marital residence.

Joanne stated that her current monthly earnings were insufficient to meet her monthly bills and she had to take money from her savings accounts to pay the bills. Joanne said that she had been receiving $1,200 as temporary monthly maintenance payments, starting on August 27, 2008.

At the close of the evidence, the parties submitted posttrial briefs to argue their respective positions, based upon the evidence and any supporting case law. On August 13, 2009, by agreement of the parties based upon delays in filing the posttrial briefs and responses, the court entered a bifurcated judgment of dissolution, terminating the parties' marriage and reserving his final ruling on the pending matters.

11

The Court's Oral Ruling on Reserved Matters

The trial judge made an oral ruling on the record on November 13, 2009, discussing his findings and resolving all remaining property issues. The court noted that neither party in the instant case argued that the interim distribution of assets was not a fair and equitable agreement. The judge stated that he would "adopt that previous [agreed interim] distribution and add to it."

According to the court, that interim agreement included: proceeds from the sale of Earl's interest in the Cipher company, which involved Earl and Joanne each receiving $10,000 from an initial distribution, and subsequently receiving an additional $100,000 each. Beyond that, the court stated that Earl received $25,600 and Joanne received $38,400 in cash (from the balance of the funds from the sale of the Cipher business). From proceeds of the marital home, Earl received $12,177.60 and Joanne received $75,000.[5]

The court individually addressed the items listed in the "Final Pretrial Stipulation." First, the court found that the money market account at the Sheridan Bank, now $15,500.33, represented a portion of the proceeds from the sale of Baum Signs and awarded each party one-half of that account. Next, the court addressed the First Bank money market account valued at $18,046. According to the judge, Earl testified that was the remaining amount of the money in his possession from the earlier interim distribution of assets, thus the court awarded that entire amount to Earl. The court found that the Citizens Bank account of $4,942 "has always been solely in Earl's name" and awarded that full amount to Earl. The court also noted that a Wachovia Securities account, consisting of $1,112, was money that passed to Earl as a

_____

[5] Based upon those figures, Joanne received 60% of the total funds released in the earlier interim distribution assets, including the sale of the Cipher business and the marital residence, and Earl received 40%.

beneficiary to his mother's estate and was a nonmarital asset which belonged to Earl.

The court awarded Joanne's current residence to Joanne after finding that Joanne used proceeds from the initial interim distribution of assets in Will County to make the down payment on the residence, and the mortgage was solely in her name. The court found that the Stofan, Agazzi & Company investment account of $2,520 was always solely in Joanne's name and awarded that full amount to her. The court then discussed the First National Bank money market account, valued at $13,962, which held the proceeds from Joanne's 2001 personal injury claim. The court found that money was a marital asset, but awarded that entire amount to Joanne. The court addressed the two National City Bank accounts solely in Joanne's name, in the amounts of $49,000 and $31,661. The court found the money in those accounts originated from the funds Joanne was previously awarded in the interim distribution of assets. Accordingly, the court awarded both of those accounts to Joanne and did not include those as additional assets to be re-distributed in the instant case.

The court awarded both parties their respective vehicles and any equity or debt attached to those vehicles. The judge stated that neither party proved values relating to the division of personal property, and he awarded each party whatever personal property they currently had in their possession.

Regarding Earl's income, the court discussed that, after the liquidation of the business assets when Earl and his partner sold Baum Signs, some of the Cipher and/or Baum Signs personnel started the new company, Correct Electric. The judge noted that Earl testified he had the opportunity to buy into Correct Electric, but chose not to do so at the advice of his divorce lawyer. The court found that, although Earl was not under any requirement to buy into the new

13

business, he brought another individual, his girlfriend, into this new business and she became president of Correct Electric.

The court stated there was no evidence presented to show she was qualified to take this position with the new company and found that her "ascension in the presidency of this company or the person who was running this company was somewhat contrived." The court found that it was "very suspicious" that the attorney who represented Correct Electric, when fighting subpoenas issued by Joanne, eventually became co-counsel in Earl's divorce case. The court determined that Earl had someone he could trust, his girlfriend, and had her placed in a position with the company that Earl would have otherwise held. The court found that Earl did this to avoid bringing those assets or opportunities into this divorce proceeding. According to the judge, the evidence showed that, based on Earl's current salary at Correct Electric, he made between $71,000 and $72,000 per year.

The court then addressed case law regarding imputing income to a party. The court referred to the *Smith* case (*In re Marriage of Smith*, 77 Ill. App. 3d 858 (1979)), which discussed the ability of the maintenance-paying spouse to contribute to the other spouse's support. The court held that the *Smith* case distinguished the *current* level of income from the *ability* a spouse has to earn income. In the instant case, the court found that, factoring in Earl's *ability* to earn income and the opportunity he passed up, specifically his girlfriend's position with the company earning over $120,000 per year, the court could award maintenance to Joanne imputing $120,000 per year as Earl's ability to produce income.

The court then gave detailed findings applying the factors to be considered when making a maintenance award under section 504 of the Illinois Marriage and Dissolution of Marriage Act

14

(Act) (750 ILCS 5/405 (West 2008)). The court found that Joanne's monthly net income, based upon her salary and some investment income, was approximately $2,250. The court then found that each of the parties' monthly expenses were approximately $3,200.[6] Looking at factor 2 of section 504 of the Act, the court found that Joanne's monthly expenses exceeded her income. The court detailed that this had been a lengthy marriage, over 33 years. Further, the court found that Joanne's current salary was the extent of her future earning capacity and that it had already addressed the ability or potential earning capacity of Earl. The court found that both parties were currently living at a general standard of living they enjoyed during the marriage but, based on Joanne's income, she would not be able to do all of the things that she was able to do during the marriage. The court also considered the ages and health of the parties. Both parties were 50 years old. According to the evidence, the court found that Earl was in good physical health at the time of the hearing, but Joanne suffered from several conditions which required medical treatment.

The court found, in reviewing all of the statutory factors and considering the length of the marriage, that Joanne should receive permanent maintenance. The court determined that Joanne's monthly expenses exceeded her income by approximately $950, which the court found to be a starting point for the maintenance amount. Then, "looking at the totality of the circumstances," the court said Earl had the ability to earn substantially more than what he was actually earning and awarded Joanne $1,850 monthly permanent maintenance. The court denied any request for retroactive application of the maintenance award.

---

[6] The court noted that it considered that Joanne did not share a residence with anyone and Earl shared his residence with his girlfriend for purposes of monthly income and debts.

Finally, the court addressed the issue of distribution of retirement accounts that accrued during the marriage. The court stated that those accounts included: the American Funds, the City of Republic, the I.B.E.W. Local 701 Retirement Savings Funds, the Integra Bank IRA, the Cipher 401(k), the Tellabs 401(k), the AIG 401(k), and the Valic 403(b). The court awarded each party one-half of each of those accounts. The court entered the judgment order on all remaining matters on December 18, 2009, and Earl filed a timely notice of appeal.

ANALYSIS

On appeal, Earl argues that the trial court erred by awarding Joanne an excessive amount of permanent maintenance after imputing the gross income of Correct Electric's president, Linda Mauk, to Earl when determining the appropriate amount of maintenance to be awarded to Joanne. Additionally, Earl contests the amount of maintenance ordered because the court did not consider the unequal distribution of marital property, when balancing Joanne's monthly needs and Earl's own monthly income and household expenses.

Joanne argues that the court was within its discretion to determine Earl's current and future ability to pay maintenance after imputing income to Earl. Further, Joanne contends that the trial court did not abuse its discretion in the division of marital property or award her excessive maintenance.

An award of maintenance is within the sound discretion of the trial court, and an appellate court will not disturb a trial court's distribution of property or award of maintenance unless the trial court abused its discretion or the award was against the manifest weight of the evidence. *In re Marriage of Schiltz*, 358 Ill. App. 3d 1079, 1084 (2005). An abuse of discretion occurs when no reasonable person would agree with the position adopted by the trial court. *Schwartz v.*

16

*Cortelloni*, 177 Ill. 2d 166, 176 (1997). The determination of maintenance must be balanced against the property award in a dissolution case. *In re Marriage of Koberlein*, 281 Ill. App. 3d 880, 884 (1996). However, a former spouse requesting maintenance should not be required to dissipate assets or impair capital if the other spouse has sufficient assets to meet both his needs and the needs of the former spouse. *Koberlein*, 281 Ill. App. 3d at 885. Thus, we must consider the distribution of the marital assets as well as the needs of Joanne and the earning ability and needs of Earl to evaluate whether the trial judge abused his discretion in this case.

Section 504 of the Act enumerates 12 factors to be considered by a court when rendering an award of maintenance in a dissolution case. 750 ILCS 5/504 (West 2008). However, this court has held, "In awarding maintenance, the trial court has wide latitude to consider the needs of the parties and is not limited to the factors enumerated in section 504." *Schiltz*, 358 Ill. App. 3d at 1084.

The trial judge, in the case at bar, gave a very detailed ruling from the bench concerning his findings as they related to the section 504 factors. The court found that this was a lengthy marriage of over 33 years and noted that each of the parties' monthly expenses were approximately $3,200. Further, the judge found Joanne's monthly net income, based upon her salary and some investment income, was approximately $2,250 and that Joanne's monthly expenses exceeded her income.

The judge focused on testimony establishing that Earl was the primary wage earner during the marriage while Joanne devoted her time to taking care of the home and child. Both parties were 50 years old and currently living at a general standard of living they enjoyed during the marriage. The court considered that Joanne's current salary was the extent of her future earning

17

capacity and, based on Joanne's income, she would not be able to participate in all of the activities that she was able to enjoy during the marriage.

The court observed that Joanne also had health problems while Earl enjoyed good health. During the divorce proceedings, in addition to paying $1,200 for temporary maintenance, Earl was able to "loan" thousands of dollars to Mauk and another financial investor of Collect Electric, buy Mauk a new car for $24,074, purchase a new Yukon truck and golf cart, and go on a $20,000 "shopping spree" while the divorce proceedings were pending. Based on these findings, we conclude the trial court's decision to award permanent maintenance to Joanne was supported by the record.

Next, Earl claims that the court's amount of maintenance was excessive because the trial court did not factor in the unequal property distribution, favoring Joanne, set out in the interim order, which distributed the proceeds from the sale of the marital home and the proceeds from the sale of Earl's share of the Cipher business. We acknowledge that the Will County order awarded $223,400 (60%) of those funds to Joanne and $147,777 (40%) of those funds to Earl. The judge found that neither party in the instant case argued that the interim distribution of assets was not a fair and equitable agreement, so he used that as his starting point to distribute the remaining assets. We agree this was a sound approach in this case.

Having determined the trial court correctly decided permanent maintenance was appropriate, we turn to Earl's contention that he did not have the ability to pay maintenance in the amount ordered by the court in this case. The case law provides that the ability of the maintenance-paying spouse to contribute to the other's support can be properly determined by considering both current and future ability to pay ongoing maintenance. *In re Marriage of Smith*,

18

77 Ill. App. 3d 858. In *Smith*, a case which is factually similar to the case at bar, the parties were married for 34 years and the 52-year-old wife had little prospect of earning an adequate salary to meet her needs. In that case, the husband voluntarily reduced his income by retiring during the pending divorce proceedings in an attempt to avoid paying maintenance. *Smith*, 77 Ill. App. 3d at 862. In that case, the court held:

> "In our view, the word 'ability' indicates that we should consider the level at which the maintenance-paying spouse is able to contribute, not merely the level at which he is willing to work. Thus, we hold that it was appropriate for the trial court to look at the husband's prospective income, as well as his current actual income, in setting the level of maintenance, particularly where the difference between actual and potential income is a result of totally voluntary retirement." *Smith*, 77 Ill. App. 3d at 862.

In *Smith*, the court considered the circumstances surrounding the husband's retirement as it related to the divorce proceedings and found that his motives for retirement were called into question. *Smith*, 77 Ill. App. 3d at 862-63. In that case, the trial court determined that the husband chose to resign his position as president of a company during the pendency of a dissolution of marriage proceeding to become a consultant which reduced his income by 50%. *Smith*, 77 Ill. App. 3d at 862-63. On appeal, the court upheld the trial court's determination that the husband had the ability to pay more maintenance than his current retirement income would seem to allow based on his position at his previous employment. *Smith*, 77 Ill. App. 3d at 863.

Regarding Earl's current and prospective ability to pay maintenance, the record reveals that Earl was healthy at the time of the divorce. He voluntarily opted to sell his share of the Cipher and Baum Signs businesses during the pendency of the divorce. First, the trial judge noted

19

that Earl was not under any requirement to buy into the new business, Correct Electric, after selling his ownership interest in Cipher and Baum Signs. Next, the court observed that, while Earl voluntarily chose *not* to buy shares in the new corporation himself, Earl voluntarily brought his girlfriend, Mauk, into the new business by loaning her money to become the majority shareholder in the new corporation that would ultimately compensate Earl as an hourly employee. The court found that Mauk's "ascension in the presidency of this company or the person who was running this company was somewhat contrived."

The trial judge was in the best position to judge the believability of the witnesses. *In re Marriage of Nagel*, 133 Ill. App. 3d 498, 502 (1985). After considering the evidence, the trial judge found the presidency of Earl's girlfriend was a "contrived" business arrangement and concluded the undisputed historical events demonstrated that Earl had set up his live-in girlfriend to be president in the new company in order to reap the full financial benefits from the services he provided to this business. The court found that Earl did this to avoid bringing those assets or opportunities into this divorce proceeding.

It is well established in Illinois, "[i]n order to impute income, a court must find that one of the following factors applies: (1) the payor is voluntarily unemployed ***; (2) the payor is attempting to evade a support obligation ***; or (3) the payor has unreasonably failed to take advantage of an employment opportunity." *In re the Marriage of Gosney*, 394 Ill. App. 3d 1073, 1077 (2009); *In re Marriage of Rogers,* 213 Ill. 2d 129 (2004).

In the instant case, Earl was employed so the first factor did not apply. The court found the second factor to be present, specifically that Earl was attempting to evade a support obligation based on the "contrived" structure of the Correct Electric corporation and the salary paid to

Earl's girlfriend, the named president of Correct Electric. As to the third factor, the court found that Earl passed up the opportunity to have held his girlfriend's position as president of the company, earning over $120,000 per year. Consequently, the court awarded maintenance after imputing $120,000 of his girlfriend's annual salary to Earl when considering Earl's present and potential ability to produce income.

The court's finding that the circumstances surrounding Earl's current wages of approximately $71,000 was structured in a contrived fashion, to both conceal his full current income and minimize the value of his financial assets through Mauk, his girlfriend, was based on the evidence presented and the court's own credibility determinations. For example, Earl told the court he was employed by Correct Electric as a senior project manager and was compensated by the corporation at the rate of merely $34 per hour, in spite of his previous corporate experience as both an owner and investor in Cipher. The court heard evidence that established Earl's girlfriend had no previous corporate experience but brought a significant salary into the household which she shared with Earl. Further, the evidence also established that, although Earl did not purchase shares in the corporation, the shareholders agreement required other shareholders to obtain consent before transferring their shares of the business, but was structured to allow only one shareholder, Earl's girlfriend, to transfer her shares to Earl in the future without the prior approval of the other shareholders. The record also showed that Earl provided funds to his girlfriend to buy the majority shares of Correct Electric by advancing those funds to her at the time she purchased the corporate shares. Near the time Mauk purchased her shares, when Correct Electric was incorporated, Earl was listed as a director of Correct Electric but that document was later amended. Earl testified that his divorce lawyer advised him not to invest in the company. Correct

21

Electric is a company very similar to the Cipher company previously partially-owned by Earl. Moreover, the record included testimony indicating that the current majority owners of Correct Electric, Earl's girlfriend and Earl's sister, established the amount of wages Earl would be paid for his responsibilities as project manager for Correct Electric.

Earl contends that the he never earned over $100,000 in wages in the past and the court should not impute that amount here. This view over simplifies Earl's earning ability because it only considers the amount of *wages* Cipher paid to Earl before the divorce without considering the investment income Earl derived during the marriage from his ownership interest in Cipher while also drawing separate wages from Cipher. For example, the 2002 tax return shows Earl's total wages to be $99,944, but the total *income* listed in the 2002 tax return shows Earl's income to be $111,292, taking into consideration the dividends Earl received from Cipher totaling $8,765.

In the instant case, the trial court received evidence that the contrived circumstances surrounding the executive income Earl's live-in girlfriend brought into his household allowed Earl to underestimate his current and potential ability to pay court-ordered maintenance by minimizing the income he received from Correct Electric. Here, the court's finding that Earl was attempting to evade support obligations was not contrary to the manifest weight of the evidence. Based on this finding, we also conclude the trial court properly determined certain factors were present to allow the court to impute additional income to Earl, measured, in part, by reference to his girlfriend's contrived executive salary.

Accordingly, we conclude the trial court did not abuse its discretion by imputing the additional ability to earn income to Earl and then awarding $1,850 per month as permanent maintenance for Joanne.

22

CONCLUSION

For the reasons stated above, the judgment of the circuit court of La Salle County is affirmed.