NOTICE

Decision filed 06/22/21. The text of this decision may be changed or corrected prior to the filing of a Petiion for Rehearing or the disposition of the same.

2021 IL App (5th) 190440-U

NO. 5-19-0440

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| WILLIAM EDWARD PARKER, | ) | Monroe County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 10-D-67 |
| | ) | |
| SHELLY GAYE REICHERT, | ) | Honorable |
| | ) | Thomas B. Cannady, |
| Respondent-Appellee. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Wharton and Vaughan* concurred in the judgment.

**ORDER**

¶ 1 *Held*: The circuit court did not abuse its discretion in modifying, rather than terminating, petitioner's maintenance obligation based on petitioner's early retirement at age 62; however, we vacate the amount of maintenance awarded and remand for the entry of a new order clarifying the amount of imputed income for purposes of calculating maintenance and addressing whether it is appropriate to impute income to petitioner past his normal retirement age of 65.

¶ 2 Petitioner, William E. Parker (Eddy), filed, in the circuit court of Monroe County, a petition to terminate or, alternatively, modify the monthly maintenance that he had been ordered to pay respondent, Shelly G. Reichert, pursuant to a previously entered judgment of dissolution.

---

*Justice Overstreet was originally assigned to participate in this case. Justice Vaughan was substituted on the panel after Justice Overstreet ascended to the Illinois Supreme Court and has read the briefs and listened to the oral argument recording.

1

Following a hearing, the court entered an order modifying Eddy's monthly maintenance obligation from $3000 to $1555.75. Eddy filed a motion to reconsider, which the court denied. Eddy appeals, arguing that the court abused its discretion by reducing, rather than terminating, his monthly maintenance obligation and, alternatively, in calculating the reduced amount of monthly maintenance. For the following reasons, we affirm in part, reverse in part, and remand with directions.

¶ 3                                    I. Background

¶ 4      In 1981, Eddy, 26, and Shelly, 18, were married. Throughout their marriage, Eddy was employed by Ameren as a lineman, and Shelly was a self-employed hair stylist. The marriage produced two children: Ashley (born October 18, 1987) and Taylor (born March 27, 1989). In 2008, after both children had reached the age of 18, Eddy and Shelly separated.

¶ 5                              A. Dissolution Proceedings

¶ 6      In 2010, Eddy, 55, filed a petition for dissolution of marriage and, in 2011, Shelly, 47, filed a counterpetition. The case was subsequently assigned to Judge Richard Aguirre for disposition.

¶ 7      In April 2011, following a hearing on temporary issues, Judge Aguirre ordered Eddy to pay Shelly temporary maintenance in the amount of $3000 per month. No transcript of the hearing was included in the record certified to this court. Prior to the hearing, both parties filed financial statements disclosing their monthly incomes, monthly expenses, and assets. Eddy's financial statement listed a net monthly income of $8202 (gross monthly income of $12,140 less $3938 in deductions), along with monthly expenses totaling $2925 (Eddy's monthly expenses of $1925 plus the children's monthly expenses of $1000). Eddy's financial statement also listed the following retirement assets: an Ameren SIP valued at $146,325; a Vanguard 401(k) valued at

2

$61,320; a National Electric Annuity valued at $2400; a union pension valued at $189 per month at age 65; and an Ameren pension valued at $2750 per month at age 65. Shelly's financial statement listed a net monthly income of $1418.60 (gross monthly income of $2269.58 less $850.98 in deductions), along with monthly expenses totaling $2416.78. Following the hearing, Judge Aguirre ordered Eddy to pay Shelly temporary maintenance in the amount of $3000 per month.

¶ 8    In October 2011, Judge Aguirre held a hearing on all remaining issues. No transcript of the hearing was included in the record certified to this court. Prior to the hearing, both parties filed amended financial and position statements. Eddy's amended financial statement listed a net monthly income of $8266 (gross monthly income of $12,433 less $4167 in deductions) and total monthly expenses of $2014 (no children's expenses). Eddy's amended financial statement revealed no change to the value of his Ameren and union pensions but slight increases to the value of the remaining retirement assets. Specifically, the value of the Ameren SIP had increased to $176,875.45, the value of the Vanguard 401(k) had increased to $63,523.59, and the value of the National Electric Annuity had increased to $2681. Shelly's amended financial statement listed a reduced net monthly income of $420.06 (gross monthly income of $2278.10 less $1858.04 in deductions) and total monthly expenses of $4225.64. Shelly's amended financial statement also listed the same retirement assets as Eddy's amended financial statement, including those with projected values at age 65.

¶ 9    In his position statement, Eddy asserted that Shelly should receive no more than $1000 per month in maintenance "plus 10% of [Eddy's] net income of $99,192.00 per year," which represented his average net income over the past few years. According to Eddy, Shelly's amended financial statement, which listed a net income of approximately $1000 less than her

prior financial statement, did not include Shelly's income from her other jobs. In her position statement, Shelly requested permanent monthly maintenance in the amount of $4200 based on the income and lifestyle of the parties, as well as her contribution to the marriage and failure to achieve a viable career. Shelly claimed that Eddy had a nonmarital National Electric Annuity, from which he would receive approximately $2681 per month at age 65. Shelly requested her marital share of Eddy's union and Ameren pensions, which would result in Eddy receiving approximately $4135.50 per month at age 65. Shelly also noted that Eddy's Ameren SIP and 401(k) plan had a cash value of approximately $240,399, and she requested 62% of the cash accounts, or approximately $149,000.

¶ 10    In November 2011, Judge Aguirre entered a judgment of dissolution, dissolving Eddy and Shelly's 30-year marriage and dividing the parties' marital property. The court awarded each party the personal property currently in their possession and, additionally, awarded Eddy the draw knife, pipe wrench, climbers (hooks), 20-gallon kettle, and bench vice located in the shed at the marital residence. The court awarded 42% of the value of the remaining nonretirement marital assets to Eddy, which totaled approximately $170,579 and included the following: (1) a Commerce Brokerage account valued at $24,383; (2) a Stifel Nicolaus account valued at $120; (3) a Utility Employees Credit Union account valued at $44,022; (4) a Commerce Bank certificate of deposit valued at $40,000; (5) First Bank joint savings and checking accounts valued at $14,778; (6) a Commerce Bank checking account valued at $32,431; (7) cash in the amount of $10,000; and (8) guns valued at $4845. The court awarded 58% of the value of the remaining marital assets to Shelly, which totaled $206,953 and included the following: (1) the marital residence valued at $181,500; (2) a Hartford mutual fund valued at $16,248; (3) a Regions account valued at $7605; and (4) her life insurance valued at $1600. The court also

4

ordered Eddy to pay Shelly a single lump-sum payment in the amount of $12,500. The court equally divided the retirement assets with cash value between the parties, awarding each party a value of $120,399.52. Shelly was also awarded a *pro rata* share of Eddy's Ameren and union pension benefits. With regard to nonmarital property, Eddy was awarded his mineral rights lease, his National Electrical Annuity Plan, and "his Model 37 Deer slayer Standard Rifle."

¶ 11    In addition to dividing the parties' property, the circuit court ordered Eddy to pay Shelly's attorney fees in the amount of $2000 and to pay Shelly maintenance in the amount of $3000 per month. The court provided, however, that the "maintenance award shall be reviewed five (5) years or later after the entry of this Judgment, on request by either party." The court also required that Eddy maintain his currently existing life insurance policy with Shelly named as the beneficiary but indicated that "[t]his requirement shall be reviewed at the same time as the review of the maintenance issue referred to hereinabove."

¶ 12                      B. Postdissolution Proceedings

¶ 13    In November 2016, Eddy filed a petition to terminate or, alternatively, modify maintenance pursuant to section 510 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510 (West 2016)), alleging that the circuit court's previously entered judgement of dissolution provided for review of the maintenance award after five years. Eddy also alleged that termination, or a reduction, of maintenance was warranted because there had been a substantial change in circumstance since the entry of the judgment of dissolution. In support, Eddy alleged, *inter alia*, as follows: his increased age and health problems interfered with his ability to continue working for Ameren as a lineman; he would be eligible to collect social security benefits when he turned 62 years old on February 12, 2017; he planned to retire with full benefits on January 13, 2017; he would receive his final paycheck on March 3, 2017;

5

Shelly's income had increased since the entry of the judgment of dissolution; and the Act had been amended in 2015 to provide a specific formula and guidelines for maintenance in both dissolution and postdissolution proceedings. Eddy further asserted that his retirement had been "contemplated by the court at the time of the entry of the Judgment of Dissolution of Marriage." Eddy noted that each party had been awarded half of the cash retirement accounts and that Shelly had also been awarded a portion of his Ameren and Union pensions, which she would begin receiving in April 2017. Lastly, Eddy alleged that Shelly had sufficient income and assets to support herself without maintenance.

¶ 14    On January 3, 2017, Shelly filed an answer to Eddy's petition, along with a petition for attorney fees. In her answer to Eddy's petition, Shelly denied Eddy's allegations of a substantial change in circumstances and his allegation that his retirement had been contemplated by the circuit court at the time of the entry of the judgment of dissolution. Shelly also denied that she had sufficient income and assets to support herself without maintenance and requested that the court deny Eddy's petition. The case was subsequently assigned to Judge Thomas Cannady.

¶ 15    On March 1, 2017, following several continuances, Judge Cannady held a hearing where both parties appeared with counsel. After hearing argument from counsel, Judge Cannady entered a written order directing the parties to submit briefs and setting the matter "for oral argument on standard of proof with regard to whether reviewable maintenance per the Judgment requires the movant to show a substantial change in circumstances and related procedural issues on April 19, 2017."

¶ 16    Prior to the scheduled hearing, both parties submitted briefs outlining their respective arguments. In Eddy's brief, he argued that he was not required to show a substantial change in circumstances in a review proceeding and that the circuit court should review the issue of

6

maintenance *de novo*. Eddy further argued that Shelly was required to show a continued need for maintenance and to demonstrate her efforts to become self-supporting. In Shelly's brief, she agreed that Eddy was not required to prove a substantial change in circumstances but argued that he was required to show "his voluntary retirement and unilateral reduction in income were in good faith."

¶ 17 On April 19, 2017, Judge Cannady entered a written order, noting that, although the case had been "called for oral argument on burden of proof," both parties had reached the same conclusion in their respective briefs. Judge Cannady set the matter for hearing on all remaining issues on July 19, 2017.

¶ 18 On July 19, 2017, Judge Cannady held an evidentiary hearing on Eddy's petition to terminate, or modify, maintenance. At the outset of the hearing, numerous exhibits documenting the respective finances of Eddy and Shelly were admitted into evidence by agreement, including the parties' financial affidavits, bank records, and tax returns.

¶ 19 Eddy then testified to the following details on his own behalf. During the marriage, Eddy and Shelly lived with their two children at the marital residence they established in Columbia, Illinois. In September 2008, after both children had moved away to attend college, the parties separated. Shelly remained at the marital residence, and Eddy moved into a nearby two-bedroom apartment. Eddy resided in the same apartment until he retired from Ameren in 2017. At the time of the hearing, Eddy lived in a one-bedroom cabin located on 100 acres of wooded land in Arkansas, which he had purchased for $165,000. Taylor had since returned to Columbia, Illinois, and Ashley had recently moved to Portland, Oregon.

¶ 20 Eddy testified to the following details regarding his employment at Ameren. In 1979, after working as an apprentice in construction for three years, he obtained employment as a

lineman for Ameren at the age of 24. As a lineman, Eddy worked long hours, including many hours of overtime, and he performed physically demanding job duties, including climbing poles to "keep the meters turning." From 2008 to 2017, Eddy worked nearly the same number of overtime hours. He explained that there was both voluntary and required overtime at Ameren. For instance, when he was classified as an emergency trouble man in 2016, Ameren required four daily hours (20 weekly hours) of standby time. According to Eddy, the previously ordered maintenance equaled his pay for approximately "a 30-hour week," so he was getting 10 hours of pay and living on the overtime. In addition to his monthly maintenance obligation and living expenses, Eddy also voluntarily paid approximately $60,000 in college expenses for Ashley and Taylor with no assistance from Shelly.

¶ 21 Eddy testified to the following details leading to and surrounding his retirement from Ameren. Although Ameren allowed for early retirement at age 55, Eddy had always planned to retire at age 62. Eddy would have had to take reductions in his pension if he retired at age 55 but his pension was fully vested at age 62. Eddy acknowledged that he was not required to retire when he turned 62 years old but felt he would have to either retire or "go on workmen's [*sic*] comp" due to declines in both his physical and mental health. Eddy claimed that he suffered from knee, hand, and shoulder issues, all of which interfered with his ability to perform his job duties in recent years. Eddy experienced his first knee issue while he was working in 2012. Eddy explained that, during his second week of working power outages in New Jersey (caused by hurricane Sandy), his "knee went out" while he was walking behind the truck, causing him to fall to the ground. Although he recovered after resting for 15 minutes, Eddy experienced a similar knee issue, which he described as a "trick knee," every few weeks following the initial incident. His knee would occasionally go out while he was carrying a ladder during a reconnect, and he

8

would "just lay in the yard." On several occasions, customers offered to call 9-1-1 but he refused, advising that he just needed a few minutes. In recent years, Eddy experienced more frequent issues with his knee, and he began experiencing issues with his shoulder when he lifted objects at work. Eddy did not seek medical treatment because he did not want to have surgery or apply for workers' compensation benefits. Eddy had also developed issues with his hands, including a loss of grip strength, and had x-rays taken, which revealed arthritis in his knuckles. During his last few years of employment with Ameren, Eddy's physical conditions deteriorated to the point that he was unable to climb poles. He would, instead, "call a crew for a reconnect because a reconnect consisted of carrying a ladder to the service and over fences and being chased by dogs and whatever." Ameren made him responsible for the crews because of his experience for switching and clearing lines for crews and his knowledge of the circuits and subs.

¶ 22    Eddy testified that, despite Ameren's accommodation of his declining physical health, he had concerns regarding his ability to continue working as a lineman, which required him to maintain a commercial driver's license (CDL). Specifically, due to his high blood pressure and macular degeneration, which he described as retinal damage from repeated exposure to arcing electrical wires caused by nighttime storms, he had concerns over passing the physical that Ameren required to renew his CDL in 2018. Eddy also claimed that, starting in 2016, long work hours over prolonged periods of time caused him to suffer fatigue, which resulted in mental mistakes and a decline in his memory. Although no one was injured due to his mental mistakes, Eddy became concerned about the crew's safety. For these reasons, Eddy, 62 years old at the time, voluntarily retired in 2017 after 41 years of employment with Ameren.

¶ 23    Eddy next identified the financial affidavit that he prepared in April 2017. Eddy's affidavit disclosed a total monthly gross income of $4460.74 ($2231.74 from his portion of his

9

Ameren pension, $80 from his portion of his union pension, $2137 in social security retirement benefits, and $12 from a premarital mineral rights investment) and a total monthly net income of $3479.96 after deductions totaling $980.78 ($700 for federal income tax, $130.78 for state tax, and $150 for health insurance). Eddy testified that he was not eligible for Medicare coverage and had no dental or vision coverage. According to Eddy's affidavit, his monthly living expenses (household, transportation, and personal) totaled $2168, reducing his available monthly income to $1311.96.

¶ 24    Eddy also testified regarding additional expenses not listed on his financial affidavit. Although he did not have a mortgage on the cabin, he anticipated making additions to the cabin or building a home on the land. Eddy explained that the cabin was very small, and he would "need to add on probably another 25-foot by 15 extension." Due to the small size of the cabin, he had kept some of his belongings, including clothing, in the shed. Eddy's washer and dryer were also in the shed, but he would be unable to do his laundry in the shed during the winter months. Eddy anticipated expending $1200 per year to gravel the road leading to his cabin. Eddy also planned on making two or three trips per year to visit Ashley in Portland, Oregon, which he claimed would cost approximately $2500 each round trip.

¶ 25    In the affidavit, Eddy also disclosed his assets and the estimated value of each asset. Eddy listed a Commerce Bank checking account with a balance of $36,272.85 and a First Security checking account with a balance of $30,685.56. Eddy also listed the following investment accounts and securities: 600 shares in Clean ENG Foles valued at $1530; 250 shares in Facebook valued at $35,512.50; 1000 shares in GE valued at $30,034.11; and 151 shares in Valero valued at $10,047.64. Eddy listed an estimated fair market value of $165,000 for his cabin and land in Arkansas, along with various motor vehicles valued at $16,000. Eddy also

clarified that he owned a GMC Sierra valued at $22,000. Lastly, Eddy listed an Ameren life insurance policy valued at $7000 and an Edward Jones IRA valued at $224,581.20.

¶ 26    Eddy testified that, after he prepared the affidavit in April 2017, he closed the Commerce Bank checking account and moved those funds into a First Security savings account in Arkansas. Eddy also explained that he had a lower balance in each account because he had spent approximately $8000 after he prepared the affidavit.

¶ 27    Near the end of Eddy's direct testimony, Eddy's counsel asked him if there was anything that had not been addressed in his testimony that the circuit court should consider regarding the petition to terminate. The following question-and-answer exchange occurred:

> "[Eddy's Counsel]: Is there anything else that you think the Court should consider with regard to your reasons for retirement or your income or expenses that the Court should consider in its ruling that we haven't already addressed?
> A.  Can you repeat the question?
> THE COURT: Edd[y], the question—hold on—the question is, is there anything else I need to hear concerning your petition? Anything you want to tell me? That's all she's asking.
> A.  Well, I—me and my girls are trying to move on as a family. And we want— you know, we want to be done, but we try to move on and reestablish, and the way things are the last few years with maintenance and everything, so her [name is] always brought up about this, that, and the other, but we're trying to move on as a family. Is that okay?"

Eddy further responded that he planned on giving Taylor around $4000 to cover expenses of her upcoming wedding on March 24, 2018.

¶ 28    On cross-examination, Eddy was questioned regarding several documents relating to his pension benefits that were admitted as exhibits. A document produced by Ameren on January 25, 2013, titled "Retirement Benefit Statement," provided a projected calculation of the pension benefits Eddy would receive if he retired on March 1, 2017, with 37 years of vesting service. The document also provided that Eddy's "Normal Retirement Date" was March 1, 2020. A document from the union also provided a projected calculation of the pension benefits Eddy would receive

11

after 39 years of service. The document specified that Eddy would be eligible for the "Early Age 62" pension with a monthly payout of $140.44 in March 2017, but he would not be eligible for the "Normal" pension with a monthly payout of $189 until March 2020. When questioned regarding the union document, Eddy acknowledged that the effective date of his normal pension was March 2020 and agreed that he had elected to receive the pension classified as "Early Age 62." Eddy also confirmed that, throughout his employment with Ameren, he had contributed to a 401(k) plan and the plan continued to accrue following the parties' divorce.

¶ 29     Eddy was also questioned regarding various financial documents, including tax returns and earning statements, that were admitted as exhibits. Eddy reviewed the documents and confirmed that his total wages were $158,107.86 in 2011 and $177,776.28 in 2015, and his "Medicare wages" were $166,484.97 in 2016. Eddy agreed that he was aware of his monthly maintenance obligation when he notified Ameren of his retirement in October or November of 2016.

¶ 30     The following exchange occurred after Eddy admitted that he knew Shelly's maintenance income would be reduced if he retired:

> "Q. Okay. Did you make provision for you to continue your maintenance payment to her after you retired?
> A. The provision was for five years, to be reviewed.
> Q. So in your mind, at the end of five years, you were not going to be required to pay her maintenance; is that what your thought process was?
> A. That was my thoughts and the Judge's ruling.
> Q. Okay. And your income today is reduced to Social Security, your pension from Ameren, and a small annuity account; correct?
> A. Correct.
> Q. Less than $5,000 a month, right?
> A. Yes, sir.
> Q. Did you—did you make any plant [*sic*]—did you put any money aside to continue to pay the maintenance obligation based on that current income?
> A. Us being divorced—supposedly us going and being divorced, no, I didn't. I didn't—I mean, that's my definition of divorce. It was—it was for five years to be reviewed. I would be under only Social Security and retirement after five years to be

12

reviewed. We're divorced. She's—in my mind, she's no longer my responsibility; just like I'm not her responsibility. If I would have fell or got hurt, who would have took [*sic*] care of me? If I would have went out there and got—my dad fell off a pole when he was 48 and broke his neck and his wrist. Now, if that would have happened to me, she would have been scott-free [*sic*]. Who would have took [*sic*] care of me?

Q. So there—you've made no other—your position is, and I understand it, your position is after five years, I'm off the hook?

A. We're divorced."

Eddy then reiterated that he had expressed "hopes" that he would retire at age 62 during the parties' marriage. Eddy estimated that he made this decision when he was around 50 years old.

¶ 31 Eddy was then questioned about his real estate in Arkansas. Eddy explained that he had decided to purchase the small cabin with 100 acres in lieu of a larger home with less acreage "to have a little bit of freedom and live out [his] Autumn years" of his life. He planned to hunt and fish on the property but denied plans to farm the land. He used his tractors to mow a couple of fields, which were food plots for deer and turkey. Eddy testified that, in anticipation of being clear of his maintenance obligation, he planned on saving for a year to add on to his cabin or to build a new house on the property.

¶ 32 Eddy acknowledged that his savings account balance had been reduced by $8000 approximately three months before the trial. He explained that, even though his regular monthly expenses were around $2200, he had spent nearly $6200 in recent months to cover his maintenance obligation, attorney fees, and to pay for the two trips to Portland. In addition, after moving to Arkansas, he purchased new tools, including two chain saws and an air compressor. Eddy admitted that he performed his own yard work, which typically involved mowing with a tractor and operating a weed eater and leaf blower. Eddy claimed, however, that he could "go usually about two hours a day, and that's it." Eddy denied receiving any kind of medical disability benefits from Ameren and agreed that Ameren had attempted to accommodate his deteriorating physical condition. Eddy also denied seeking medical treatment for his knee,

13

shoulder, and memory loss issues. Lastly, Eddy agreed that he earned substantially more income than Shelly throughout their marriage.

¶ 33    Following cross-examination, Judge Cannady stated that he had some follow-up questions regarding the Arkansas property that he felt were "significant." Eddy confirmed that he had paid $165,000 in cash for both the cabin and approximately 100 acres of land. Eddy estimated that 95% of the acreage was in timber. When asked whether he had checked into the value of the timber or selling the timber, Eddy stated that he "had it appraised for tax purposes." Eddy denied making inquiries to companies to clear the timber and denied receiving payments from the government for farming or using the timber.

¶ 34    On redirect examination, Eddy clarified that the monthly payout from his union pension had been reduced by approximately $50 due to his retirement at age 62, but he denied that his Ameren pension had been reduced because he was "fully vested at 62." Eddy's counsel concluded redirect by asking Eddy if he had testified regarding his desire to retire at age 62 at the 2011 trial. Shelly's counsel objected based on relevance. Eddy's counsel argued that Eddy's prior testimony regarding retirement was a basis for provision allowing review of maintenance after five years. Judge Cannady sustained the objection, stating that he did not think he could "get into a previous Judge's analysis and the facts presented as to the rulings why the previous Judge set this for review at five years." Judge Cannady then expressed a desire to review evidence relating to Eddy's income from 2010. Judge Cannady indicated that he would check the court file, which contained the folder with exhibits from the original trial, for Eddy's 2010 tax return.

¶ 35    Next, Shelly testified to the following details as an adverse witness. Shelly resided in the former marital residence, which had three bedrooms and sat on five acres of land, with no

14

monthly mortgage payment. Shelly also operated her business, Shear Country Styling Salon, from the residence. Shelly produced additional income by working at salons in Bunker Hill, Illinois, and St. Louis, Missouri, but she had to pay to rent stations at those salons. In addition, Shelly worked for an accreditations company based in Fairfax, Virginia, which required her to travel to various cosmetology schools or barber colleges throughout the country for purposes of evaluating eligibility for federal funding.

¶ 36    Shelly was questioned extensively regarding the financial affidavit she prepared on June 22, 2017, which provided the following details. Shelly's gross yearly income had increased from $29,917 in 2015 to $30,438.74 as of December 18, 2016. Shelly's gross monthly income totaled $3982.31 (employment earnings of $2536.56 plus the payouts from Eddy's pension in the amount of $1445.75), and her net monthly income after deductions totaled $2939.01. Shelly's monthly living expenses totaled $3766.84 ($1892.16 household, $1083.08 transportation, and $791.60 personal), which resulted in a monthly deficit of approximately $827.83. Although Shelly listed no debts, her affidavit indicated that she owed $34,478.96 for a 2016 Nissan Murano.

¶ 37    Shelly's affidavit also listed her assets, including two assets with cash value—a Reliance Bank checking account with a balance of $135,761.02 and a Regions Bank checking account with a balance of $13,343.13. Shelly testified that her Reliance Bank checking account had increased by approximately $60,000, from January 9, 2015, to May 31, 2017. Shelly agreed that she had been able to save $60,000 in that time.

¶ 38    The statements produced by Reliance Bank pertaining to Shelly's checking account reveal the following details. Shelly's checking account had a beginning balance of $76,546.27 in January 2015 and an ending balance of $106,374.24 in December 2015. The statements show

15

that, from January to December 2015, Shelly deposited over $43,000 into the account and debited (checks and other charges) over $15,000 from the account. Shelly's checking account had a beginning balance of $109,146.90 in January 2016 and an ending balance of $133,744.61 in December 2016. The statements show that, from January to December 2016, Shelly deposited over $55,000 into the account and debited over $28,000 from the account. The available records from 2017 reveal the following: a January balance of $138,050.89 following $4306.28 in deposits; a February balance of $140,810.25 following $3422.36 in deposits and debits totaling $663; a March balance of $129,616.07 following $4805.75 in deposits and debits totaling $15,999.93; an April balance of $130,959.78 following a $1924.32 deposit, a $108.02 payout from Eddy's union pension, and debits totaling $688.63; and a May balance of $135,761.02 following a $1698.52 deposit, a $54.01 payout from Eddy's union pension, a $1304.62 payout from Eddy's Ameren pension, and debits totaling $746.91.

¶ 39    Shelly testified that the Regions Bank checking account was primarily used for business and the income she earned from working at all three salons went into that account. She acknowledged that the statements from her Regions checking account reflected payments from a credit card company called "Intuit." Shelly confirmed that the Intuit payments were debited to her account when customers paid with credit or debit cards using a scanner that attached to an iPad. Shelly's tax records revealed that she received payments from Intuit, a third-party network, in the gross amount of $25,496.30 in 2016 and $25,661.36 in 2015.

¶ 40    In the financial affidavit, Shelly also disclosed two investment accounts as assets—the Hartford Funds and the American Funds—with a total estimated value of $91,319.67. Shelly listed the estimated fair market value of the marital residence as $180,000. Shelly also disclosed that she had a life insurance policy from Country Companies with a death benefit valued at

16

$12,000 and a Franklin Templeton Individual Retirement Account, which came from a withdrawal from Eddy's 401(k) through Ameren, valued at $179,095.89. In addition, she had $49,023.17 (as of December 30, 2016) in a Polaris Platinum III life insurance account, which she had failed to disclose on her financial affidavit.

¶ 41    Shelly then testified regarding the income and expenses listed on her tax returns. When asked about the Schedule C profit or loss from a business listed on her 2015 tax returns, Shelly confirmed that she had listed total gross receipts or sales of $28,557 and claimed the total included her income from all three salons and the accreditations firm. The circuit court later clarified that the total gross receipts or sales did not include the $1360 Shelly earned from the accreditations firm, which had been listed as "Other Income" on her 2015 tax return. She acknowledged the tax documents from Intuit indicated that she had received $25,661.36 in credit or debit card payments, which included tips, for services she rendered in 2015. Shelly claimed that a majority of her clients paid by debit or credit card. Shelly denied accepting checks and claimed that she seldom received cash for her services. Shelly charged anywhere from $5 to $22 for haircuts and $65 to $75 for a color. When asked if she had received only $253 in cash payments in 2015, Shelly replied, "Yes, at the most." Shelly agreed that she had earned a yearly average of approximately $27,000 working at the salons in 2015 and 2016. She also agreed that, in 2016, she provided free hair services valued at $1377 and her gross income from the national accreditation firm had increased to $12,540. In addition, Shelly received $1395.75 per month (approximately $16,749 per year) from Eddy's Ameren pension and approximately $50 per month from Eddy's union pension.

¶ 42    Regarding expenses listed on her 2015 tax return, Shelly confirmed that she had spent approximately $2074 on advertising expenses, including business cards and calendars, and

17

approximately $1325 on car expenses in 2015. Shelly also claimed that she had $1301 expenses for travel in 2015, which included parking and shuttles when she traveled for the accreditation firm. When asked if she had earned a gross total of $1360 from the accreditation firm and spent $1301 in travel expense while working for the firm, Shelly indicated that she did not know how her accountant "breaks that down."

¶ 43    Shelly also testified to the following as a witness on her own behalf. Shelly was 54 years old at the time of the hearing. Shelly was 18 years old when she married Eddy in 1981. During the marriage, Shelly primarily stayed at home with the children and Eddy was the "bread winner." Throughout the marriage, Eddy worked long hours, including regular overtime, and earned a substantially greater income than Shelly. Following the parties' divorce, Shelly attempted to increase her income by exploring additional employment and educational opportunities. Shelly began working for the accreditation firm and earned an additional $12,500 in 2016, although she had to take nine weeks off work from the salon and had no control over the number of assignments. She also attempted to improve her income by taking a number of educational courses, including a financial aid course so that she would qualify for a student financial aid advisor for a cosmetology school or barber college. Shelly had been looking for jobs in that field, but she was unsure of the yearly salary for such positions. She had looked into other jobs because she found it difficult "to stand and cut all day" at her age.

¶ 44    With regard to her income from the salons, Shelly clarified that the number of payment transactions listed by Intuit occasionally reflected a single credit card payment for multiple services or clients. Shelly also had to pay for necessary supplies out of the gross income she earned from her work at the salons. While she had been able to save money since the divorce, she did not have a pension plan through her employment. She had been awarded various assets in

the judgment of dissolution, including interests in Eddy's annuity account and pensions. Shelly agreed that she had been able to pay all of her monthly expenses when she received $3000 in monthly maintenance payments. Shelly also agreed that she had been unable to pay her monthly expenses when Eddy stopped making the monthly maintenance payments and she received only the payouts from Eddy's pensions, which equated to roughly half of the monthly maintenance. Although Shelly had increased her income and taken additional educational courses since the divorce, she felt there was nothing more she could do to further increase her income.

¶ 45     At the close of the evidence, the circuit court directed the attorneys to submit written closing arguments by August 18, 2017. As directed, the attorneys timely filed closing arguments and, following a status hearing, the court took the case under advisement.

¶ 46     In his written closing argument, Eddy requested that the circuit court enter an order terminating his monthly maintenance obligation to Shelly. In support, Eddy argued that, since the entry of the judgment of dissolution in 2011, Shelly's yearly income had increased from $11,095 to $51,160.80, while his income decreased from $146,836 to $53,528.88. Specifically, Shelly's most recent financial affidavit listed a total gross monthly income of $3932.31 ($2536.56 from her employment and $1395.75 from her previously awarded share of Eddy's Ameren pension) without including the income she received from various investments ($3673 yearly average), while Eddy's most recent financial affidavit listed a total gross monthly income of $4460.74. According to Eddy, Shelly's financial affidavit listed an inflated amount of $3766.84 in monthly expenses, given that a number of her listed expenses were "written off" or deducted from her gross income as business expenses on her tax returns. Eddy's financial affidavit listed total monthly expenses of $2168, but he expected his monthly expenses to increase when he made improvements to his one-room cabin. Eddy maintained that Shelly worked as a hair stylist

19

throughout the parties' marriage and had increased her income since the divorce by taking additional classes and obtaining additional employment. Eddy claimed that his income had permanently decreased due to his retirement from Ameren, whereas Shelly, who was eight years younger than Eddy, could continue to increase her income. Eddy maintained that, after 40-plus years of employment, he retired from Ameren at age 62 due to a deterioration in his physical condition and the physically demanding job duties. According to Eddy, there was no evidence showing that his retirement was in bad faith. Shelly, who was awarded approximately 55% of the marital assets in the judgment of dissolution, owned various assets valued at $606,047.54 and Eddy owned various assets valued at $562,832.

¶ 47 In her written closing argument, Shelly requested that the circuit court enter an order awarding her $1555.75 "as maintenance on a permanent basis, subject to termination or modification as provided in the [Act]." In support, Shelly noted that $1555.75 represented the difference between the previous maintenance award ($3000) and the payouts she presently received from Eddy's pensions ($1445.75). Shelly claimed that she had made a good-faith effort to become self-supporting by taking additional classes and obtaining additional employment. According to Shelly, her employment income increased from $11,095 in 2011 to $20,621 in 2016, which included $12,540.49 from additional accreditation work. Shelly also noted that the parties had a long-term marriage lasting over 30 years, and that she had a limited education (beautician's school and license) because she had married Eddy when she was 18 years old and had been primarily responsible for raising the parties' two daughters. According to Shelly, record evidence did not indicate that she could "ever support herself in the lifestyle to which she is accustomed without maintenance from [Eddy]." Despite Eddy's testimony regarding his deteriorating physical health, Shelly argued that his early retirement from Ameren at age 62 was

20

an attempt to evade his maintenance obligation. In support, Shelly recited Eddy's testimony on cross-examination that he was ready to move on after paying maintenance for five years and that he was "tired of hearing discussions about Shelly and what Shelly needs."

¶ 48    On April 12, 2019, the circuit court entered a written order modifying maintenance. The court listed the nine factors contained in section 510(a-5) of the Act and stressed that factors one and seven had been important to its determination. The court also stated that it had considered all other factors, including the factors contained in section 504(a) of the Act.

¶ 49    The circuit court's written order also included the following factual findings in support of its decision. Throughout the 30-year marriage, Eddy, the primary wage earner, worked on a full-time basis for Ameren. Shelly was primarily responsible for the children's daily activities and care, and she operated a hair salon from her home on a part-time basis. Shelly was 18 years of age at the time of the marriage and, other than her beautician school and license, she had no education beyond high school. When the parties divorced in 2011, Eddy earned $158,107.86 and Shelly earned $11,095. In 2016, Eddy earned $166,487.97 and Shelly earned $20,621. In considering Eddy's retirement, the court found that Eddy's "normal retirement age" was 65 but made no finding regarding Eddy's yearly retirement income. The court concluded that Eddy voluntarily left his employment with Ameren at age 62, and that Eddy had the burden of showing that his "early" retirement was in good faith. The court noted that Eddy failed to present any medical evidence or testimony showing that he was physically incapable of performing his work duties for Ameren.

¶ 50    Next, the circuit court addressed the requirements for imputing income. Citing *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 30, the court determined that the following must be shown to impute income: "(1) The payor has become voluntarily unemployed; (2) The

payor is attempting to evade a support obligation; or (3) The payor has unreasonably failed to take advantage of an employment opportunity." The court concluded that Eddy's voluntary retirement at the first opportunity, despite his ability to continue working, satisfied the first factor. The court, again, noted the absence of medical evidence or testimony showing that Eddy was unable to perform the required job duties. Furthermore, the court noted that Eddy had recently passed his CDL requirements and had been accommodated by Ameren. Thus, the court found it appropriate to impute income to Eddy.

¶ 51　Lastly, the circuit court made findings regarding Shelly's attempts at self-sufficiency, noting that Shelly had sought other educational and employment opportunities and successfully increased her income since the divorce in 2011. Nevertheless, the court found that Shelly would "be unable to ever maintain herself in the standard of living provided during the marriage without an award of maintenance." Thus, the court granted Shelly's request and reduced Eddy's monthly maintenance obligation from $3000 to $1555.75. In doing so, the court indicated that the maintenance award was subject to modification or termination as permitted by the Act.

¶ 52　On May 7, 2019, Eddy filed a motion to reconsider pursuant to section 2-1203 of the Code of Civil Procedure (735 ILCS 5/2-1203 (West 2018)), requesting that the circuit court vacate its April 12, 2019, order and enter a new order terminating his maintenance obligation. Eddy alternatively requested that the court either terminate maintenance when Eddy turned 65 or set the matter for review in February of 2020. In support, Eddy, once again, argued that the court had previously considered Eddy's eligibility to retire at 62 when it awarded Shelly maintenance subject to review in five years in the 2011 judgment of dissolution. Following a hearing, the court denied the motion to reconsider. This appeal followed.

22

¶ 53                                    II. Analysis

¶ 54    Eddy's main contention on appeal is that the circuit court erred by modifying, rather than terminating, maintenance. In support, he argues that the court erred: (1) "in finding that Shelly had a continued need for maintenance" and "in failing to apply the guidelines set forth in 750 ILCS 5/504 and 750 ILCS 5/510" of the Act, (2) in imputing income to him, and (3) in failing to terminate maintenance as required under the new statutory guidelines.

¶ 55    We first address Eddy's first and third arguments, which we consider together as they are closely related. We initially note that Eddy relies on "the new statutory guidelines" in support of his first and third arguments. Eddy argues that "[u]nder the new statutory guidelines, enacted in 2015, Shelly already earns 40% of the parties' gross income; therefore, maintenance is not appropriate." Eddy asserts that "[a]ny modifications to the maintenance statute[,] effective in 2015, apply to all cases decided after its' [*sic*] effective date." We disagree.

¶ 56    We initially note that Eddy has failed to cite legal authority in support of his assertion. Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) provides that the appellant's brief shall include an argument containing the appellant's contentions, the reasons therefor, citation of the authorities, and the pages of the record on which the appellant relies. This court "is not a repository into which an appellant may foist the burden of argument and research." (Internal quotation marks omitted.) *Enbridge Pipeline (Illinois), L.L.C. v. Murfin*, 2020 IL App (5th) 160007, ¶ 72. Nevertheless, we conclude that Eddy's argument regarding "the new statutory guidelines" fails on the merits. In our view, section 801(c) of the Act, which makes the guidelines applicable to "modification" proceedings, does not extend to the "review" proceedings at issue in the present case. 750 ILCS 5/801(c) (West 2016); *In re Marriage of Brunke*, 2019 IL App (2d) 190201, ¶ 53. Here, the parties expressly agreed that Eddy was not

23

required to show a change in circumstances because the judgment specifically allowed for review. See *Brunke*, 2019 IL App (2d) 190201, ¶ 51 (unlike a modification proceeding, "[a] review proceeding results from a court order that specifically provides for a review of that order" and does not require proof of a change in circumstances). Thus, we reject Eddy's arguments pertaining to the recently enacted statutory guidelines. We now turn to Eddy's remaining arguments.

¶ 57    Section 510 of the Act governs petitions for modification, termination, or review of maintenance. 750 ILCS 5/510 (West 2010). Section 510(a-5) requires a circuit court to consider the following nine factors in determining whether to modify or terminate maintenance:

(1) a change in employment status of either party and whether the change was made in good faith; (2) any reasonable efforts made by the receiving party to become self-supporting; (3) any present or future impairment of earning capacity of either party; (4) the tax consequences of the maintenance payments; (5) the duration of maintenance payments previously, or remaining to be, paid, if any, relative to the length of the parties' marriage; (6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage, and the present status of such property; (7) any increase or decrease in the income of the parties since the prior judgment; (8) the property acquired, and currently owned, by either party after the entry of the judgment of dissolution of marriage; and (9) any other factor found by the court to be just and equitable. *Id.* § 510(a-5)(1)-(9).

¶ 58    In addition, section 510(a-5) of the Act requires a circuit court, in any proceeding seeking to modify or terminate maintenance, to consider the factors set forth in subsection (a) of section 504. *Id.* § 510(a-5). Section 504(a) sets forth the following 12 factors:

24

(1) the respective incomes and property of the parties, including the property awarded or assigned to the party seeking maintenance; (2) the parties' needs; (3) the parties' present and future earning capacity; (4) any impairment of the present and future earning capacity resulting from the party seeking maintenance devoting time to domestic duties; (5) the time necessary for the party seeking maintenance to acquire appropriate education or training to obtain employment; (6) the parties' standard of living during the marriage; (7) the duration of the parties' marriage; (8) the parties' respective ages and physical and emotional conditions; (9) any tax consequences of the property division; (10) any contributions the party seeking maintenance made to the education or career of the other spouse; (11) any valid agreements between the parties; and (12) any other factors found by the court to be just and equitable. 750 ILCS 5/504(a)(1)-(12) (West Supp. 2011).

Although a circuit court must consider the above factors, it is not required to make specific findings for each factor if the record establishes the basis for an award of maintenance. *Blum v. Koster*, 235 Ill. 2d 21, 38 (2009).

¶ 59 Generally, a circuit court's award of maintenance is presumed to be correct. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 26. A circuit court's decision to modify, or terminate, maintenance will not be disturbed absent a clear abuse of discretion. *Blum*, 235 Ill. 2d at 36. A circuit court abuses its discretion when its " 'ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *Id.* (quoting *People v. Hall*, 195 Ill. 2d 1, 20 (2000)).

¶ 60 Here, we cannot say that the circuit court abused its discretion by modifying, rather than terminating, maintenance. The court expressly stated that it considered the factors set forth in both sections 510(a-5) and 504(a) of the Act. In doing so, the court found the first and seventh

25

factors in section 510(a-5)—"(1) any change in the employment status of either party and whether the change has been made in good faith" and "(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought"—particularly important in its determination.

¶ 61 The evidence presented at the hearing showed that, throughout the parties' 30-year marriage, Eddy was the primary wage earner while Shelly cared for the parties' children and operated a hair salon from home on a part-time basis. Shelly was 18 years old when the parties married and, aside from beautician school, she had no education beyond high school when the parties divorced in 2011. Although Shelly had increased her income by pursuing additional education and employment opportunities, Eddy's income continued to greatly exceed Shelly's income in the years following the divorce. Eddy's income decreased substantially following his retirement in 2017, when Eddy began receiving social security benefits and both parties began receiving their respective shares of the payouts from Eddy's pensions. Eddy's reduced net monthly income of $3479.96 continued to exceed Shelly's increased net monthly income of $2939.01, which included a $1444.25 monthly payout from Eddy's pension. Shelly testified that, despite increasing her income and receiving payouts from Eddy's pensions, she was unable to pay all of her monthly expenses without the monthly maintenance payments following Eddy's retirement. Shelly's most recent financial affidavit listed a monthly deficit of $827.83. In contrast, Eddy's most recent financial affidavit listed his available monthly income, after paying all of his monthly expenses, as $1311.96. This evidence supports the circuit court's decision to reduce, not terminate, Eddy's maintenance monthly maintenance obligation. Thus, we cannot say that no reasonable person would take the view adopted by the court.

¶ 62    We next consider Eddy's argument that the circuit court erred by imputing income to him due to his retirement when calculating the maintenance award. Eddy specifically asserts that the court erred by failing to specify the amount of imputed income and by finding that he failed to present evidence showing he was unable to perform his job.

¶ 63    "The ability of the maintenance-paying spouse to contribute to the other spouse's support can be properly determined by considering both a current and future ability to pay ongoing maintenance." *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 30 (citing *In re Marriage of Lichtenauer*, 408 Ill. App. 3d 1075, 1089 (2011)). "Courts should consider the level at which the spouse is able to contribute, not merely the level at which he is willing to work." *Id.* (citing *Lichtenauer*, 408 Ill. App. 3d at 1088). A circuit court may impute income to a payor spouse if the court finds: "(1) the payor has become voluntarily unemployed, (2) the payor is attempting to evade a support obligation, or (3) the payor has unreasonably failed to take advantage of an employment opportunity." *Id*. A reviewing court "will not disturb a trial court's finding of a party's income for the purpose of setting a support award absent an abuse of discretion." *Id*.

¶ 64    Here, the circuit court imputed income to Eddy due to his early retirement at age 62. In doing so, the court found that Eddy's normal retirement age was 65. Although Eddy testified that he could have retired at age 55 with lower benefits and that he had always planned to retire at age 62, the court's finding is supported by Ameren's "Retirement Benefit Statement," which lists Eddy's normal retirement date as March 1, 2020. We also note that the court's finding is supported by Eddy's financial statement from the dissolution proceeding, which lists the values of his union and Ameren pensions at age 65. Thus, the court's finding that the normal retirement age for Eddy was 65 is supported by the evidence presented at the hearing and additional documents in the record on appeal.

¶ 65    The circuit court further found that Eddy "voluntarily left his employment at the earliest opportunity." In support, the circuit court found that "[n]o medical testimony was presented to the Court nor did Edd[y] offer any testimony indicating to the Court that he was incapable of performing his duties for Ameren or that he had any medical reason for his retirement." The court, instead, found the evidence showed that Eddy had "recently passed his CDL licensing requirement and was actively accommodated by his employer." Although Eddy testified extensively regarding his physical difficulties in performing his job duties at Ameren shortly before his retirement, it appears, although not expressly stated, that the court discounted certain aspects of Eddy's testimony regarding the circumstances surrounding his retirement. Thus, the court's finding that Eddy became voluntarily unemployed is supported by the evidence.

¶ 66    Nevertheless, we find it necessary to vacate the portion of the circuit court's order setting the amount of maintenance and remand for clarification on the issue of Eddy's imputed income. As Eddy correctly notes, the court failed to specify the amount of imputed income, which hinders our ability to determine whether the court abused its discretion in calculating maintenance. We note that the court, after imputing an undisclosed amount of income to Eddy, actually reduced Eddy's monthly maintenance obligation from $3000 to $1555.75. Although not expressly stated, it appears the court attempted to account for the difference between the previous maintenance award and the pension payouts Shelly began receiving after Eddy's retirement. We also note that the court, despite finding Eddy's normal retirement age was 65, neither set the matter for review nor ordered a further reduction of maintenance when Eddy turned 65. Thus, we remand the matter back to the court for clarification of these issues.

¶ 67    On remand, the circuit court should specify the amount of income imputed to Eddy and explain the basis for its calculation, including the time period for which it imputed income to

28

Eddy. The court should also explain its rationale for imputing income to Eddy while also reducing his monthly maintenance obligation from $3000 to $1555.75.

¶ 68 Based on the foregoing, we hold that the circuit court did not abuse its discretion by reducing, rather than terminating, maintenance. See *In re Marriage of Waller*, 253 Ill. App. 3d 360, 362 (1993) (holding that the circuit court properly denied the respondent's petition to terminate maintenance where the respondent had not reached the customary age of retirement and his retirement was the result of circumstances within his control). We also hold that the court's finding that Eddy was voluntarily unemployed due to his early retirement at age 62 is supported by the evidence. However, we vacate the court's reduced maintenance award and remand for the entry of a new order that clarifies the amount of income imputed to Eddy for purposes of calculating maintenance and addresses the issue of imputing income to Eddy past his normal retirement age of 65.

¶ 69                                   III. Conclusion

¶ 70 For the reasons stated, the judgment of the circuit court of Monroe County is affirmed, in part, and vacated, in part, and this cause remanded for entry of an additional order.


¶ 71 Affirmed in part and vacated in part; cause remanded with directions.