NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230119-U

NO. 4-23-0119

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 2, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| DEBORAH K. TENHOUSE | ) | Adams County |
|     Petitioner-Appellant, | ) | No. 18D237 |
|     and | ) | |
| DOUGLAS W. TENHOUSE, | ) | Honorable |
|     Respondent-Appellee. | ) | Holly J. Henze, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE DeARMOND delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where respondent's retirement triggered pension distributions to petitioner, petitioner (1) has not shown the trial court abused its discretion when it terminated respondent's maintenance obligation upon his early retirement and (2) has not shown that the factual findings on which the court relied were against the manifest weight of the evidence.

¶ 2    In October 2019, the trial court entered a judgment of dissolution of marriage between petitioner, Deborah K. Tenhouse, and respondent, Douglas W. Tenhouse. In January 2023, the court granted Douglas's petition to terminate the award of $3000 a month in "lifetime maintenance" to Deborah.

¶ 3    On appeal, Deborah argues the trial court abused its discretion when it terminated her maintenance. We affirm.

¶ 4                     I. BACKGROUND

¶ 5        In July 1985, the parties were married in Adams County. In December 2018, Deborah filed a petition for dissolution of marriage. Deborah was then 52 years old and was not employed. Douglas was then 54 years old and employed by County Financial. The parties' four children were all adults. In February 2018, Douglas filed a counterpetition for dissolution.

¶ 6        In October 2019, the trial court granted the petitions. It ordered Douglas's pension and 401(k) retirement account to be divided equally as of the date of the dissolution. The parties filed qualified domestic relations orders (QDROs) to achieve those divisions. The court further ordered Douglas to pay Deborah $3000 a month in "lifetime maintenance" based on Douglas's salary of approximately $130,000. It "acknowledged that [Douglas was] paying [approximately] $510 more than the statutory requirement or as the amount that would be set had the parties used the Illinois family software *** guidelines."

¶ 7        On December 1, 2020, Douglas filed a petition to terminate maintenance due to a substantial change in circumstances. He alleged he would be retiring at the end of the month and, based on the application of the statutory guidelines to his postretirement income, his maintenance obligation should cease. In February 2021, Deborah filed a petition for rule to show cause based on Douglas's failure to pay maintenance.

¶ 8        In December 2022, the trial court had an evidentiary hearing on both Douglas's petition to terminate maintenance and Deborah's petition for rule to show cause. Douglas testified on his own behalf. Deborah testified and called Shelly Krueger, the certified public accountant (CPA) who prepared Deborah's tax returns, as a witness.

¶ 9        The parties agreed Deborah started to receive $2400 from her share of Douglas's pension as a consequence of his retirement; this $2400, unlike the maintenance payment, was taxable for her.

¶ 10    Douglas testified he was, at the time of his retirement, a property claims supervisor for Country Financial, which had been his employer since 1987. He supervised insurance claims adjusters for "catastrophic losses"—typically storms. He decided to retire in autumn 2020; he gave his employer notice of his intention in October.

¶ 11    Douglas stated he decided to retire based on "several factors." First, because of "the stress of the job," he never intended to work past his late fifties. Further, he knew at least two other people in "the industry" who retired at a similar age. Further, "[s]everal years" before he retired, his employer increased the territory for which he was responsible, which increased the stress of his job. He started to have high blood pressure. He found himself becoming "less patient with [his] employees" and "less patient with the clients [he] was dealing with." He worked at Country Financial for 34 years, with 25 of those years in management. He wanted to leave before he started being "nonproductive." Furthermore, he had been working since he was 14 and wanted a chance to enjoy life while his health was good.

¶ 12    Upon retirement, he started to receive approximately $2600 in pension payments; after taxes and insurance were withheld, he received approximately $1800 a month. Country Financial also made a one-time payment of $33,515.58 to Douglas for his unused vacation days.

¶ 13    When Douglas left Country Financial, he started a gifts and collectibles business. His first shop was in Quincy, Illinois. He recently opened a second shop in Monroe City; publicly available information suggests this is Monroe City, Missouri. Douglas got the idea for his business after retiring. He enjoyed going to auctions and thrift stores to collect items and always wanted to run a shop. He withdrew $63,500 from his 401(k) to cover the expenses of starting the business. He withdrew approximately $55,000 more from the fund, leaving him with $264,682.87 as of the hearing. His shops were open from 10 a.m. to 5 p.m., Tuesday through Saturday. In 2021, the

business lost $24,601. He increased sales in 2022, but because of the expenses associated with opening the second store, he expected to show a loss for 2022 as well. He had one part-time employee in Monroe City.

¶ 14		Douglas said his stress level dropped dramatically when he stopped working for Country Financial. At Country Financial, most of his phone calls were addressing complaints, and the calls were often "heated." He enjoyed running the stores—he said the business was a "hobby."

¶ 15		Douglas lived in a condominium he rented from his mother for $400 a month. He purchased his work vehicle when he retired. He traveled to London to visit his daughter, took a cruise paid for by a friend, and traveled once to Las Vegas for business reasons.

¶ 16		According to Douglas, Deborah worked as an elementary school teacher during the early years of the couple's marriage. She stopped teaching in 1991, after their second child was born. She returned to teaching for another few years but quit permanently when their third child was born. Later, she had part-time jobs in retail.

¶ 17		Deborah testified she moved to Columbia, Missouri, at the end of 2019. She took out a mortgage to buy a house. She continued to live in this house. She moved to Columbia to be near her elder daughter and her daughter's children.

¶ 18		Deborah testified she had a current Illinois teaching certificate. However, Douglas "didn't really encourage [her] to further [her] education or further [her] career." She had not investigated what she would have to do to get a Missouri teaching certificate. She decided to stop teaching because her two sons had severe peanut allergies and their pediatrician suggested she could provide them with the best care by staying home.

¶ 19		When she moved to Missouri, she obtained a realtor's license. She worked for a small real estate brokerage until its owners dissolved it. She received what she recalled as $6000

or $7000 for selling one house. She did not look for another position. Because Columbia had many realtors and she had few local contacts, she did not believe she could be successful as a realtor. Her only current income source was the pension, but she also used money from the sale of the marital residence—of which she had approximately $75,000 left—to cover her expenses. She was spending approximately $5500 a month.

¶ 20 Deborah testified she was "not interested in teaching." She wanted to take care of her grandchildren when daycare was unavailable. She last applied for a job in September or October. Because her grandson needed daycare while he was "in between schools," she had not made any applications since then. She expected "to be able to get by on maintenance and not have to have a job possibly and to be able to be there for [her] four kids." She hoped to be present when her next grandchild was born. She also spent time helping her parents. She wanted to "be a full-time grandmother," but if she "ha[d] to go find a part-time job," she would. She expected she would only be able to find a minimum-wage job.

¶ 21 Deborah testified she did not believe it was commonplace for employees in Douglas's position to retire early. Further, she thought it was possible she would receive maintenance for another 20 to 30 years.

¶ 22 Krueger, the CPA who prepared Deborah's tax returns, testified for Deborah. She examined Douglas's tax returns and noted he was "taking the total cost of the inventory in the year that he purchase[d] it." Reporting the cost of the inventory differently could result in a higher reported income from the business.

¶ 23 Krueger stated Deborah had not been taxed on maintenance payments but did have to pay tax on the pension payments. Given Deborah's income, the pension payments were taxed at 12%.

¶ 24 Krueger also reviewed the pension QDRO. She agreed Deborah's receipt of pension distributions was entirely dependent on when Douglas chose to leave Country Financial and take the distributions. She believed an actuarial adjustment would be applied to Deborah's pension distribution to account for the likelihood she would be receiving it longer because she had started receiving it earlier. An exhibit displaying Douglas's pension calculation showed his distribution would be reduced by a factor of 0.8737 compared to what he would receive if he retired in 2029.

¶ 25 In January 2023, the trial court entered an order granting Douglas's petition to terminate maintenance:

> "The court finds that [Douglas] has met his burden of proof that a substantial change of circumstances has occurred since the entry of the Judgment for Dissolution of Marriage. The court further finds that [Douglas's] retirement was made in good faith and was not made for the purpose of avoiding his maintenance obligation to [Deborah]. [Douglas's] retirement prior to age 65 was not uncommon for those who worked in similar positions in his industry. The evidence was unrebutted by [Deborah] that he had always planned for early retirement. The substantial assets that were accumulated during the marriage and allocated at the time their marriage was dissolved supports this plan.
>
> ***
>
> [Douglas's] retirement in no way left [Deborah] destitute. She is well provided for with the monthly pension payments, and the substantial assets she received in the divorce settlement. For [Deborah] to continue to receive $3,000 per month in maintenance in addition to the $2,463 monthly pension payment could be

considered a windfall. Finally, [Deborah] is not disabled, has a license to sell real estate, has retail sales experience, and could substitute teach to easily make up for the shortfall between these amounts."

The court further denied Deborah's petition for a rule to show cause.

¶ 26    This appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28    Deborah argues the trial court abused its discretion under section 510(a-5) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510(a-5) (West 2022)) by terminating Douglas's maintenance. We disagree.

¶ 29    Section 510(a-5) of the Act provides a trial court may modify or terminate maintenance awarded in a dissolution proceeding "only upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a-5) (West 2022). When the court reviews maintenance, section 510(a-5) requires it to consider the following factors:

> "(1) any change in the employment status of either party and whether the change has been made in good faith;
>
> (2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;
>
> (3) any impairment of the present and future earning capacity of either party;
>
> (4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;
>
> (5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage and the present status of the property;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage; and

(9) any other factor that the court expressly finds to be just and equitable."

750 ILCS 5/510(a-5) (West 2022).

¶ 30        Section 510(a-5) also requires the trial court to consider all the factors included in section 504(a) of the Act (750 ILCS 5/504(a) (West 2022)) concerning the entitlement to maintenance. Those are:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable."

750 ILCS 5/504(a) (West 2022).

In dissolution proceedings, the court applies the section 504 factors only to decide whether maintenance is appropriate. See 750 ILCS 504(a) (West 2022). When maintenance is appropriate, the court applies the section 504(b-1) guidelines to determine the nature of the award—under

section 504(b-1), the amount and duration is based on the length of the parties' marriage. 750 ILCS 504(b-1) (West 2022). One guideline, for example, mandates, "For a marriage of 20 or more years, the court, in its discretion, shall order maintenance for a period equal to the length of the marriage or for an indefinite term." 750 ILCS 5/504(b-1)(1)(B) (West 2022).

¶ 31    When the trial court adjudicates a petition for a modification of maintenance, it "shall make specific factual findings as to the reason for the modification as well as the amount, nature, and duration of the modified maintenance award." 750 ILCS 5/510(c-5) (West 2022). The record here does not contain those findings.

¶ 32    A trial court's decision whether to change an award of maintenance is a matter for its discretion, and a reviewing court should not disturb its decision absent an abuse of the trial court's discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24, 89 N.E.3d 296. "An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Heroy*, 2017 IL 120205, ¶ 24. Further, a reviewing court must "defer to the trial court, as the trier of fact, on issues of witness credibility and the weight to be given to the testimony." *In re Marriage of Osseck*, 2021 IL App (2d) 200268, ¶ 49, 183 N.E.3d 980.

¶ 33    We deem the original award of maintenance to Deborah to be indefinite maintenance. Under the current version of section 504 of the Act (which was the version at the time of dissolution), the trial court is required to designate every award of maintenance as "fixed-term, indefinite, reviewable, or reserved by the court." 750 ILCS 5/504(b-2)(3) (West 2022); see Pub. Act 100-923, § 10 (eff. Jan. 1, 2019) (requiring the trial court to designate maintenance as being in one of these categories). Further, section 504(b-1)(1)(B) of the Act provides, "For a marriage of 20 or more years, the court, in its discretion, shall order maintenance for a period equal

to the length of the marriage or for an indefinite term." 750 ILCS 5/504(b-1)(1)(B) (West 2022). The statutory category most closely matching the "lifetime" maintenance awarded Deborah is indefinite maintenance.

¶ 34 Deborah contends the trial court abused its discretion when it terminated her maintenance. Her argument lacks a clear structure. We separate it into eight components:

(1) Under section 510(a-5) of the Act, "[e]ven if both parties contemplated or foresaw that Douglas was going to retire early, there is no mention of it in the Judgment, thus even if contemplated, early retirement cannot be used as a factor for modifying maintenance."

(2) The court focused solely on whether Douglas's retirement was in good faith and failed to give any weight to whether Douglas had the ability to continue to pay maintenance.

(3) The court ignored the evidence before it when it found (a) Douglas's "retirement prior to age 65 was not uncommon for those who worked in similar positions in the industry" and (b) "[t]he evidence was unrebutted by [Deborah] that [Douglas] had always planned for early retirement."

(4) The evidence showed Douglas's retirement was in bad faith; his retirement was not long after the maintenance award, and his motivation was his enjoyment of life, not his health or necessity.

(5) Under cases such as *In re Marriage of Smith*, 77 Ill. App. 3d 858, 396 N.E.2d 859 (1979), the court should base maintenance on the payor's ability to pay, not his or her willingness to work.

(6) If Deborah "can be required to use marital assets she received in lieu of

- 11 -

maintenance, as asserted in the Circuit Court's order, it only makes sense that Douglas should equally be required to use marital assets he received to pay maintenance." The court thus erred in considering the portion of Douglas's pension Deborah received as part of the distribution of assets as relevant to her need for maintenance.

(7) "Douglas has financially impaired what [she] was awarded in the Judgment for Dissolution of Marriage. If Douglas would have retired at the normal retirement date, then the life and annuity for 120 months certain would begin when he retired at age 65 rather than at 56 1/2. Douglas has caused Deborah's award to be substantially reduced; and on top of that wants to terminate maintenance."

(8) Douglas agreed to pay lifetime maintenance and should be held to his agreement.

¶ 35 These contentions do not amount to a persuasive argument the trial court abused its discretion by terminating Deborah's maintenance. Deborah's argument rests heavily on four erroneous propositions: (1) section 510(a-5) of the Act bars treating foreseen events as substantial changes in circumstances allowing modification of maintenance unless the judgment explicitly provides for such changes; (2) the court considered *only* whether Douglas's retirement was in good faith; (3) Douglas's early retirement reduced the value of her award of retirement assets; and (4) the record shows Douglas agreed to $3000 a month in maintenance. Moreover, Deborah unjustifiably suggests marital retirement assets cannot replace maintenance after the party whose employment generated the asset retires. Further, the court's possible misstatement of the evidence relating to Douglas's predivorce intent to retire early is insufficient for us to override its determination Douglas's retirement was in good faith.

¶ 36 Finally, the trial court's decision was not inequitable. The court did not abuse its discretion when it implicitly found it was equitable to expect Deborah to work at least part-time to cover expenses for which her pension benefits were insufficient. Moreover, we agree awarding Deborah both the pension and the ordered maintenance would be inequitable.

¶ 37 The core failing of Deborah's argument is its insistence retirement assets divided in a divorce cannot substitute, even partially, for maintenance. The purpose of retirement assets is to substitute for employment income upon the earner's retirement. This purpose does not change when those assets are divided in a divorce. Douglas's retirement triggered pension distributions equal to more than half the maintenance payments and thus could be considered as a factor in finding a substantial change in circumstances.

¶ 38 First, Deborah is mistaken regarding how section 510(a-5) of the Act treats events foreseen or contemplated at the time of the divorce. She contends a trial court may treat a contemplated change as a substantial change in circumstances *only* if it is mentioned in the judgment. This is the inverse of what the applicable version of section 510(a-5) provides. It states:

> "Contemplation or foreseeability of future events *shall not be considered as a factor* or used as a defense in determining whether a substantial change in circumstances is shown, *unless the future event is expressly specified* in the court's order or the agreement of the parties incorporated into a court order. The parties may expressly specify in the agreement incorporated into a court order or the court may expressly specify in the order that the occurrence of a specific future event is contemplated and will not constitute a substantial change in circumstances to warrant modification of the order." (Emphases added.) 750 ILCS 5/510(a-5) (West 2022).

Thus, because the dissolution judgment did *not* state "lifetime" maintenance was required *regardless of* Douglas's contemplated retirement, the court was correct to decline to deem Douglas's possible contemplation of retirement at the time of the judgment as precluding it from finding a substantial change in circumstances.

¶ 39    We note the former version of section 510(a-5), which was effective until May 13, 2022, is silent on the contemplation or foreseeability of future events. See 750 ILCS 5/510(a-5) (West 2020); see also Pub. Act 102-823, § 5 (eff. May 13, 2022) (adding contemplation or foreseeability of future events to section 510(a-5)). We presume Deborah misread the current version of section 510(a-5) and is not suggesting the prior version applied.

¶ 40    Second, Deborah is incorrect in arguing the trial court neglected to consider statutory factors other than the good faith of Douglas's retirement. She concedes the court based the termination of maintenance partly on pension income she started to receive when Douglas retired. See 750 ILCS 5/510(a-5)(6) (West 2022) (the court shall consider the retirement benefits awarded); see also 750 ILCS 5/504(a)(10) (West 2022) (the court shall consider all sources of income, including retirement income). The court also considered Deborah's earning potential, including her training as a teacher and her possession of a realtor's license. See 750 ILCS 5/510(a-5)(2) (West 2022) (the court shall consider "the efforts *** made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate"); see also 750 ILCS 5/504(a)(3), (6), (West 2022) (the court shall consider "the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment"; the court shall consider "the realistic present and future earning capacity of each party").

¶ 41    Third, Deborah is incorrect in claiming Douglas's early retirement reduced the value of her pension award. Of course, the individual payments are lower than they would have been had she started receiving them later. However, as the QDRO indicates, this is so because the payment amount is actuarily adjusted for the expected lifetime payments. Thus, the expected value was unchanged.

¶ 42    Fourth, the record fails to support Deborah's contention Douglas agreed to the $3000 pension payment. The record shows, in April 2019, Douglas agreed to pay $3000 in *temporary* maintenance "without prejudice to either party." The record does not contain a marital settlement agreement or any reports of proceedings other than for the hearing on Douglas's petition to terminate maintenance and Deborah's petition for a rule to show cause. Thus, Deborah's claim Douglas agreed to $3000 a month in "lifetime" maintenance is unsupported.

¶ 43    Next, Deborah's argument is unrealistic when she suggests the trial court acted inequitably in treating pension payments derived from former marital assets as a substitute for maintenance. Had she and Douglas remained married, when Douglas retired, the couple would start to depend on the retirement assets to meet their living expenses; in other words, they would start to use up these marital assents. Supplying an income after retirement is the purpose of pensions and 401(k) accounts. Douglas had no significant nonmarital assets, and those assets were primarily retirement assents. Thus, both before and after his divorce, he would necessarily have to rely on retirement assets for his and Deborah's support. The court divided the retirement assets evenly between Douglas and Deborah. Thus, although Deborah did not have significant employment income, the court ensured she would have significant retirement income.

¶ 44    As the factors in sections 504(a) and 510(a-5) show, a primary function of maintenance is to limit income disparities between parties to a divorce. As we stated, the trial

court's division of assets ensured a retirement income for Deborah. Indeed, even if Douglas had continued working for another decade, their retirement incomes would not be vastly disparate. However, if the court were to require Douglas to continue paying the full $3000 in maintenance after his retirement, an income disparity in favor of Deborah would likely be *created*.

¶ 45     We do not suggest the higher-income party can necessarily retire and cease paying maintenance as soon as distributions from retirement assets become available. The trial court must consider all statutory factors, including whether the retirement was in good faith. But Deborah is incorrect in her assertion that retirement distributions from marital property should *never* serve as a substitute for maintenance.

¶ 46     Next, the record on appeal does not provide a basis for us to override the trial court's conclusion Douglas's retirement was "made in good faith and was not made for the purpose of avoiding his maintenance obligation." "In determining whether *** a change in employment is made in good faith, the crucial consideration is whether the change was prompted by a desire to evade financial responsibility ***." *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 83, 129 N.E.3d 181 (addressing a child-support obligation); see *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1076-77, 916 N.E.2d 614, 618 (2009); see also *In re Marriage of Schuster*, 224 Ill. App. 3d 958, 973, 586 N.E.2d 1345, 1356 (1992).

¶ 47     Here, Deborah does not challenge Douglas's testimony he found his job increasingly stressful. Indeed, she relies on this testimony to argue his retirement was entirely voluntary. But evidence Douglas chose to act for his own psychological benefit is not evidence he acted out of desire to evade his responsibility for maintenance. Of course, the distinction between retiring for one's own happiness and retiring to evade maintenance may be subtle. We defer to the trial court's finding of fact on this issue.

¶ 48    Deborah contends the trial court overstated the strength of the evidence showing Douglas's preexisting intent to retire early. We agree, in part, with her analysis of the court's findings, but we are not persuaded she has shown a significant error in the court's reasoning.

¶ 49    Deborah claims the trial court was incorrect when it stated Douglas's testimony he had always intended to retire early was unrebutted; she claims she testified "there was no discussion of early retirement during the marriage." However, contrary to the requirement of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), she does not cite the page of the record she relies on for this claim. The reference to the claimed testimony we find in the record is Deborah's testimony she "did not expect him to retire *that* early." (Emphasis added.) Douglas testified he "never intended to work past [his] late 50s just because of the stress of the job." These statements are consistent: Douglas retired in his mid-fifties—slightly earlier than he suggested he would.

¶ 50    Deborah contends the trial court was incorrect in finding "[Douglas's] retirement prior to age 65 was not uncommon for those who worked in similar positions in his industry." This contention is essentially correct, but it does not significantly undermine the court's finding of good faith. Deborah is also correct in noting Douglas, when asked to name coworkers who had retired at a similar age, was able to name only two. Because the evidence does not show what proportion those two represented of those in a position like Douglas's and of an age for potential early retirement, the court could not draw any quantitative conclusions about how typical early retirement was. However, when observing Douglas's testimony about his colleagues' retirements, it could form an impression of whether Douglas was attempting to fabricate a rationalization for his retirement. The court could have reasonably concluded Douglas was not fabricating a rationale.

¶ 51    Deborah argues persuasive evidence of the bad faith in Douglas's retirement comes

from its timing—-just a bit more than a year after the divorce was final. However, beyond Douglas's testimony, the record shows other explanations for the timing. The pension QDRO stated, under the plan, Douglas's turning 55 was the " 'earliest retirement age' " at which Deborah could receive pension benefits. Douglas's youngest child was 20 years old. Although Deborah's 2019 financial affidavit implies two of the parties' children were in college, her financial affidavit of December 2022 no longer shows college expenses. In 2019, the two youngest children were living with respondent. In December 2022, none of the children were living with either party. Thus, the record suggests Douglas's retirement was consistent with his children having finished their educations and living independently. Coincidentally or not, Douglas and Deborah divorced at a time of other changes in their lives. The timing of Douglas's retirement is thus not persuasive evidence of Douglas's bad faith as Deborah suggests.

¶ 52 Further, we see no abuse of discretion in the trial court's implied finding Deborah could fairly be expected to seek employment to cover the decrease in her income. Deborah's argument implies Douglas should bear the *entire* burden of undesired employment to permit Deborah to maintain her preferred lifestyle. Because Deborah could make up the difference between her pension distribution and the maintenance with part-time employment, the court's implied finding did not produce a clear inequity.

¶ 53 Finally, Deborah relies on *In re Marriage of Folley*, 2021 IL App (3d) 180427, 199 N.E.3d 267, *Smith*, and *Shellene v. Shellene*, 52 Ill. App. 3d 889, 368 N.E.2d 153 (1977), to suggest the outcome here was an abuse of discretion. However, each of those cases is distinguishable.

¶ 54 In *Folley*, the Third District held, "Where a payor spouse has sufficient assets to continue to meet his or her maintenance obligation after retirement, a reduction in income does not, *in and of itself*, constitute a substantial change in circumstances to support a termination or

reduction of maintenance." (Emphasis added.) *Folley*, 2021 IL App (3d) 180427, ¶ 38. Deborah asserts no change in circumstances occurred because Douglas could have paid maintenance out of his nonpension retirement assets. Even if we were to assume the latter part of this contention was true, we deem the trial court could still have found a change in circumstances. As we discussed, the court could properly consider Deborah's starting to receive her share of the pension distributions.

¶ 55 In *Smith*, the appellate court upheld the trial court's decision to consider the husband's income before his voluntary early retirement when setting maintenance. However, the case is distinguishable because nothing in *Smith* suggests the husband's retirement triggered distributions of retirement income to the wife, and, in any event, "the circumstances and timing of his resignation"—which occurred during the divorce proceedings—"call[ed] his motives in doing so into question." *Smith*, 77 Ill. App. 3d at 863. *Smith* is thus also distinguishable.

¶ 56 In *Shellene*, the appellate court held, "Where the change in circumstances was brought about by the party seeking the reduction in alimony payments, the court has not hesitated to reverse the granting of such reductions." *Shellene*, 52 Ill. App. 3d at 891. It stated, "[T]he cases where relief has been granted have been cases where the change in circumstances is fortuitous and not the result of deliberate action or conduct of the party seeking the reduction." *Shellene*, 52 Ill. App. 3d at 890-91. *Shellene* is distinguishable because the current version of section 510(a-5)(1) specifies the court should consider *not* whether the change in circumstances was brought about by the payor, but whether "any change in the employment status of either party *** has been made in good faith." 750 ILCS 5/510(a-5)(1) (West 2022). The trial court here complied with this legislative directive, making *Shellene* distinguishable.

¶ 57 III. CONCLUSION

¶ 58        For the reasons stated, we affirm the trial court's judgment.

¶ 59        Affirmed.